OPINION
{¶ 1} Defendant-Appellant, Dennis D. Muttart, appeals a judgment of the Hancock County Court of Common Pleas, sentencing him upon his convictions for three counts of rape. On appeal, Muttart contends that the trial court erred by admitting hearsay statements in violation of the Confrontation Clause, that the trial court erred by imposing consecutive sentences and that the trial court erred in ordering restitution. Based on the following, the judgment of the trial court is affirmed in part, reversed in part and remanded for proceedings consistent with this opinion.
 {¶ 2} In July of 1996, Muttart and Angela Hinojosa married. During their marriage, two children were born; M.M. was born April 16, 1997, and A.M. was born August 11, 1998. Muttart and Hinojosa separated in 1999 and ultimately divorced in 2001. Following their divorce, Muttart and Hinojosa had shared custody of their children and maintained an amicable visitation relationship. During this period, Muttart had moved to Michigan for work. As a result, he would generally travel back to Findlay, Ohio, every other weekend and take the children to his mother's house for their visits. In addition, Muttart would have extended visits with the children. During these extended visits, Muttart would take the children back to Michigan.
 {¶ 3} During the week of March 16, 2003, Muttart contacted Hinojosa to arrange a visitation in the middle of the week, because he had been laid off from his work. M.M. was in kindergarten at the time; therefore, Muttart came down to Findlay, Ohio, and spent the week with the children at his mother's house.
 {¶ 4} On Friday, March 21, 2003, Muttart took the children back to Hinojosa's house and returned to Michigan. That night M.M. had a panic attack and Hinojosa called Muttart to determine whether anything unusual had happened with the children that week. Muttart told Hinojosa that nothing unusual had occurred. Throughout the course of the weekend, Hinojosa continued to observe a change in the behavior of the children. M.M. continued to have panic attacks, and A.M. began interacting through an imaginary friend named "Kelly."
 {¶ 5} On Monday, March 24, 2003, Hinojosa contacted her family doctor about M.M.'s panic attacks and made an appointment for him the next day. Additionally, Hinojosa's friend, Elizabeth McQuistion, stopped by to visit. During McQuistion's visit, Hinojosa shared her concern over M.M.'s panic attacks and A.M.'s interaction with an imaginary friend. After leaving Hinojosa's house, McQuistion contacted Vicky Higgins about the children's behavior.
 {¶ 6} After meeting for dinner, McQuistion and Higgins returned to Hinojosa's house so that Higgins could speak with the children. Initially, Higgins spoke with Hinojosa about the children's behavior. Subsequently, she was allowed to speak with the children. Higgins spent some time becoming acquainted with both children, and, then, McQuistion took M.M. outside to play so that Higgins could speak with A.M.
 {¶ 7} At that point, Higgins asked A.M. about things she didn't like and observed a noticeable change in A.M.'s demeanor. According to Higgins, A.M. began to cry, would not talk, began tapping her teeth and making a regurgitation sound with her throat. After unsuccessfully attempting to calm A.M. down, Higgins asked A.M. if her imaginary friend, "Kelly," could tell her what A.M. did not like. At that point, A.M.'s behavior again dramatically changed and A.M. stated that she would go and get Kelly. A.M. then got up, ran to her bedroom and came skipping back a few seconds later. Next, Higgins asked Kelly why A.M.'s teeth hurt, and Kelly responded, "Because Daddy Dennis put his penis in [A.M.'s] mouth and made her suck it." (Tr. p. 322.) Additionally, Kelly told Higgins that "the police would come take mommy away and put her in jail if the — if she told about Daddy Dennis." (Tr. p. 324.) Finally, Kelly told both Higgins and Hinojosa that she was supposed to get a Barbie doll but that he never got it for her. (Tr. p. 325.)
 {¶ 8} Following Higgins' talk with A.M., she went outside to bring M.M. back into the house so that she could talk with him. After A.M. gave M.M. permission to talk, M.M. told Higgins that "Dennis made [A.M.] suck his penis" and that "that is S-E-X." (Tr. pp. 333-34.)
 {¶ 9} After her conversations with the children, Higgins contacted the police. That night Officer Douglas Marshall of the Findlay Police Department came to Hinojosa's house and began an investigation into the allegations of sexual abuse. Officer Marshall did not interview either of the children, because he was not trained to properly conduct such interviews.
 {¶ 10} The next day, Tuesday, March 25, 2003, Hinojosa took A.M. to see Dr. Johnson. A.M.'s appointment with Dr. Johnson was the appointment that Hinojosa had originally made for M.M. Following an exam and various testing, Dr. Johnson referred A.M. to Dr. Randal Schlievert, a child sexual abuse specialist in Toledo, Ohio.
 {¶ 11} On March 28, 2003, A.M. was interviewed jointly by Detective Matthew Tuttle of the Findlay Police Department and Brenda Westrick of Hancock County Children's Services.
 {¶ 12} In April of 2003, A.M. was examined by Dr. Schlievert at Mercy Children's Hospital in Toledo, Ohio. Prior to her exam, A.M. met with Julie Jones, the Assistant Director of Child Abuse Program at Mercy Children's Hospital. Jones' job involved meeting with the child before his or her exam with the doctor, to obtain a medical and social history of the child as well as prepare the child for his or her exam. During Jones meeting with A.M., A.M. stated that she had talked to another girl at school about Dennis, that Dennis used to be her dad but now he is not and that she tried to get out of the bathroom but he locked the door. Additionally, Jones stated that A.M. told her that "[h]e put this in my mouth," while she was pointing between her legs. (Tr. p. 161.) A.M. also told Jones that "pee came out of it," "he did it more than once," and that "Dennis put his pee pee in my pee pee." (Tr. pp. 163-64.) Finally, when Jones asked A.M. what it felt like when Dennis put his pee pee in her pee pee, A.M. stated that "it hurtie hurt." (Tr. p. 164.)
 {¶ 13} Following her meeting with A.M., Jones met with Dr. Schlievert and told him about everything that A.M. had told her for the purposes of A.M.'s exam. Dr. Schlievert then examined A.M. While Dr. Schlievert found there were no physical findings of abuse, he opined that A.M. had been sexually abused.
 {¶ 14} In October of 2003, Muttart was indicted by the Hancock County Grand Jury for three counts of rape in violation of R.C. 2907.02(A)(1)(b), felonies of the first degree. Additionally, each count alleged that the victim was less than ten years of age, pursuant to R.C. 2907.03(B).
 {¶ 15} In February of 2004, Muttart filed a motion in limine, asking the trial court to preclude the State from attempting to introduce any hearsay testimony concerning any statements made to third parties by A.M. or M.M. In his motion, Muttart included the specific testimony he wished to exclude. Additionally, Muttart argued that all hearsay statements should be excluded because such statements did not fall within any of the hearsay exceptions and because the totality of circumstances showed that such statements were unreliable. Finally, Muttart asserted that the trial court must find A.M. competent under Evid. R. 601(A).
 {¶ 16} In the State's motion in opposition of Muttart's motion in limine, the State asserted that the hearsay statements of A.M. and M.M. could properly be included as excited utterances, statements made for medical diagnosis and expert opinion testimony.
 {¶ 17} Subsequently, the trial court held a hearing on Muttart's motion in limine. At the hearing, Hinojosa, Higgins, Jones, Humphries, Crego-Stahl and Dr. Schlievert all testified. Following the hearing, the trial court filed its judgment entry, denying Muttart's motion in limine. In its judgment entry, the trial court noted that at the time of the hearing, Muttart had agreed to defer a hearing on the issue of competency. Additionally, the trial court found that A.M.'s statements to Hinojosa and Higgins were admissible under Evid.R. 803(2), the excited utterance hearsay exception; that A.M.'s statements made to Jones were admissible under Evid.R. 803(4), because such statements were made for the purposes of a medical diagnosis; and, that statements made to Humphries and Crego-Stahl were admissible under Evid.R. 803(4), because those statements were made for the purposes of psychological diagnosis and treatment. The trial court went on to exclude all hearsay statements made by A.M. to all law enforcement officers. Finally, the trial court found that Muttart's rights to confrontation were not violated under Crawford v. Washington (2004), 541 U.S. 36,124 S.Ct. 1354. Specifically, the trial court noted that in Crawford the Court had stated that non-testimonial statements do not violate the Confrontation Clause of the United States Constitution if those statements fall within a firmly rooted hearsay exception. Finding that the statements of Hinojosa, Higgins, Jones, Humphries and Crego-Stahl were non-testimonial and that each fell within a firmly rooted hearsay exception, the trial court found Muttart's rights would not be violated by the admission of those statements.
 {¶ 18} In August of 2004, a jury trial was held. At the trial, the State presented the testimony of Brenda Westrick, a child abuse and neglect investigator at the Hancock County Children's Office; Dr. Donald Johnson, A.M.'s Family Doctor; Jones; Dr. Schlievert; Higgins; Hinojosa; Officer Douglas Marshall, a Findlay Police officer; Detective Matthew Tuttle, a Findlay Police detective; and, Betty Humphries and Crego-Stahl, both licensed clinical counselors at the Findlay Family Resource Center. Muttart presented the testimony of Jeff Seaver, Rodney Burns, Sheri Horn and Judy Wilson. Each testified as a character witness. Finally, Muttart testified on his own behalf.
 {¶ 19} During the State's case-in-chief, Hinojosa and Higgins testified to the above incidents, including the statements made by A.M. and M.M. Additionally, Dr. Johnson testified that he had seen A.M. and that he recommended that Hinojosa make an appointment with Dr. Schlievert.
 {¶ 20} Jones testified that she had met with A.M. prior to A.M.'s appointment with Dr. Schlievert and that she had obtained A.M.'s medical and social history. Additionally, she testified to the above statements made by A.M. during her meeting with A.M. Dr. Schlievert also testified that he had examined A.M. Specifically, he testified that while he did not talk with A.M. himself, he did receive the medical and social history obtained by Jones for the purposes of his examination. He went on to state that there were no physical findings of sexual abuse; however, he opined that A.M. had been sexually abused.
 {¶ 21} Westrick, an investigator with the Hancock County Children's Services Office, testified that she and Detective Tuttle had jointly interviewed A.M. following the report of sexual abuse being made. Westrick did not testify to any specific statements made by A.M. during the interview. Westrick also testified that Muttart voluntarily signed a no-contact order for the children. Finally, she stated that the conclusion of her investigation was that substantial sexual abuse had taken place.
 {¶ 22} Additionally, Detective Tuttle testified that he had interviewed A.M. with Westrick and that he had informed Muttart of the allegations following his interview with A.M.
 {¶ 23} Next, Betty Humphries, a clinical counselor at the Findlay Family Resource Center, testified that she first met with A.M. in June of 2003. Humphries went on to testify that she was the person who had made an initial assessment of A.M.; therefore, she was required to talk with A.M. to obtain information to make a diagnosis. Humphries also stated that A.M. told her that she was afraid of monsters and that she did not want to see her dad anymore; however, Humphries stated that A.M. did not make any specific allegations of abuse to her. Following her meeting with A.M., Humphries recommended that A.M. obtain play therapy to deal with the issue of sexual abuse.
 {¶ 24} Finally, Connie Crego-Stahl, a clinical counselor at the Findlay Family Resource Center, testified that she had been working with A.M. as a play therapy counselor since late June of 2003. According to Crego-Stahl, in the early course of their therapy, A.M. had stated that she had a secret, which was an indicator of child abuse. Crego-Stahl went on to testify that it was not until November of 2003 that A.M. began to disclose what her secret was. Specifically, Crego-Stahl testified that "[A.M.] stated Dennis made me suck his pee pee and I tried to get out of the bathroom, but he locked the door and I don't know how." (Tr. pp. 635-636.) Additionally, A.M. told Crego-Stahl that she was afraid to go to Dennis' house and that Dennis told her that if she didn't keep her secret then her mother, Hinojosa, would go to jail. Based upon A.M.'s disclosures as well as the other information obtained during her therapy sessions with A.M., Crego-Stahl opined that A.M. was suffering from post-traumatic stress disorder and that A.M.'s behaviors were consistent with a child that had been a victim of sexual abuse.
 {¶ 25} Upon the conclusion of the State's case-in-chief, Muttart presented the testimony of several character witnesses, including Jeff Seaver, Rodney Burns, Sheri Horn and Judy Wilson. Finally, Muttart took the stand on his own behalf. According to Muttart, he had picked the children up during the week of March 16, 2003, and that he spent the week with the children at his mother's house in Findlay, Ohio. Additionally, he testified that each day he would take M.M. to school in the morning, pick him up at noon, take the children to his brother's house in the afternoon, he and the children would return home between 7:30 and 8:30 at night and that he would then bathe the children and get them ready for bed. He stated that while he did spend several hours with A.M. alone each day, nothing inappropriate took place. Finally, he stated that he believed Hinojosa had planted the story of sexual abuse in the childrens' heads.
 {¶ 26} Upon the conclusion of all the evidence, the jury found Muttart guilty on all three counts of the indictment. In January of 2005, the trial court sentenced Muttart to three consecutive life terms upon his convictions. Additionally, the trial court classified Muttart as a sexual oriented offender. It is from this judgment Muttart appeals, presenting the following assignments of error for our review.
 Assignment of Error No. I THE TRIAL COURT COMMITTED AN ERROR OF LAW BY ADMITTING HEARSAY STATEMENTS IN VIOLATION OF THE SIXTH AMENDMENT'S CONFRONTATION CLAUSE. Assignment of Error No. II THE TRIAL COURT COMMITTED AN ERROR OF LAW BY IMPOSING A CONSECUTIVE SENTENCE. Assignment of Error No. III THE TRIAL COURT COMMITTED AN ERROR OF LAW BY ORDERING RESTITUTION. Assignment of Error No. I {¶ 27} In the first assignment of error, Muttart contends that the trial court erred by allowing hearsay statements in violation of his Sixth Amendment right to confront those witnesses against him. Specifically, Muttart argues that the hearsay testimony of Westrick, Jones, Dr. Schlievert, Higgins, Hinojosa, Tuttle, Humphries and Crego-Stahl is contrary to the holding of the United States Supreme Court in Crawford v.Washington, 541 U.S. 36, 124 S.Ct. 1354.
 {¶ 28} In Crawford, the Supreme Court addressed an issue involving the Confrontation Clause of the Sixth Amendment, which states that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." Crawford, 541 U.S. at 38. The question of whether a criminal defendant's rights under the Confrontation Clause have been violated is reviewed under a de novo standard. UnitedStates v. Robinson (6th Cir. 2004), 389 F.3d 582, 592.
 {¶ 29} In Crawford, the defendant's wife, exercising her marital privilege, did not testify at his trial. 541 U.S. at 40. Before trial, however, in a tape-recorded statement to police, defendant's wife described the stabbing with which her husband was charged. Id. at 39. The statement conflicted with defendant's claim that the stabbing was in self-defense. Id. Defendant argued that his wife's statement was not only inadmissible hearsay, but violated his Sixth Amendment right of confrontation. Id. at 40. The trial court determined that the statement, though hearsay, was reliable and trustworthy, and the jury was allowed to hear it. Id. Defendant was subsequently convicted. Id. at 41.
 {¶ 30} On appeal, the United States Supreme Court scrutinized the reliability of the wife's testimonial hearsay statement under the Confrontation Clause. Id. at 42-50. The Court concluded that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." Id. at 69 (emphasis added). Accordingly, the Court held that where testimonial evidence is at issue the Constitution requires unavailability and a prior opportunity for cross examination. Id. at 68.
 {¶ 31} While the Court determined that unavailability and prior cross-examination was required for testimonial evidence, the Court also found that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framer's design to afford the State flexibility in their development of hearsay law — as does Roberts, and as would an approach that exempted such statements from Confrontation scrutiny altogether." Id. (emphasis added.) Accordingly, the Court held that with nontestimonial hearsay the Ohio v. Roberts (1980), 448 U.S. 56,100 S.Ct. 2531, reliability test still applies.
 {¶ 32} Finally, while the Court in Crawford did not "spell out a comprehensive definition of `testimonial,'" it did give the following examples of what may be included as testimonial statements:
`[E]x parte in-court testimony or its functional equivalent —that is, material such as affidavits, custodial examinations,prior testimony that the defendant was unable to cross-examine,or similar pretrial statements that declarants would reasonablyexpect to be used prosecutorially,' `extrajudicial statements. . . contained in formalized testimonial materials, such asaffidavits, depositions, prior testimony, or confessions,'`statements that were made under circumstances which would leadan objective witness reasonably to believe that the statementwould be available for use at a later trial.'
Id. at 51-52. (citations omitted.)
 {¶ 33} Thus, under Crawford, the first issue is whether the testimony is testimonial or nontestimonial. While the Court did not specifically define testimonial, the above examples show that statements made during a police investigation or court proceedings will qualify as testimonial. U.S. v. Cromer (6th Cir. 2004), 389 F.3d 662, 672-73. Additionally, it seems that statements made under circumstances that would lead a reasonable person to conclude that such statements would later be available for use at trial also qualify as testimonial under Crawford.Crawford, 541 U.S. at 52; see, also, Cromer, 389 F.3d at 673.
 {¶ 34} Turning to the testimony in the case sub judice, only the testimony of Westrick and Tuttle would qualify as testimonial under Crawford. The interview performed by Westrick and Tuttle was for the sole purpose of the police investigation. While hearsay statements made by A.M. through Westrick and Tuttle, if introduced at trial, would have violated Muttart'sSixth Amendment rights, the trial court specifically excluded the hearsay testimony of all law enforcement in its judgment entry on the motion in limine. Additionally, upon review of the record, we cannot find that either Westrick or Tuttle gave any specific hearsay testimony. While they did state what the allegations were surrounding the case, neither Westrick nor Tuttle repeated any out of court statements made by A.M.
 {¶ 35} Turning to the remaining witnesses, Jones, Dr. Schlievert, Higgins, Hinojosa, Humphries and Crego-Stahl, we do not find that any of these statements fall into the testimonial category. Initially, we also note that like Westrick and Tuttle, Dr. Schlievert did not testify to any specific hearsay statements made by A.M. While he did testify that Jones had given him the information from her meeting with A.M., he did not repeat any of those statements at trial. Thus, we will not address his testimony any further.
 {¶ 36} Turning specifically to the involvement of Jones, Humphries and Crego-Stahl, we are satisfied that these statements were made solely for the medical or psychological purposes. With each of these witnesses, we are particularly swayed by the fact that their involvement with A.M. was made solely independent of the police investigation. In other words, in the case sub judice, Jones, Humphries and Crego-Stahl were all involved with A.M.'s case without the urging of the police. Specifically, Hinojosa had contacted her family doctor prior to the police investigation about M.M. and merely changed that appointment so that A.M. could be seen. Additionally, it was Dr. Johnson who recommended that Hinojosa take A.M. to Dr. Schlievert because he was a child abuse specialist. There is no indication in the record that the police or children's services had any part in Hinojosa's taking A.M. to be examined. Furthermore, there is no indication in the record that the police or children's services advised Hinojosa to take the children to the Findlay Family Resource Center where A.M. received counseling from Humphries and Crego-Stahl. As with Jones, there is no evidence that A.M.'s counseling had anything to do with the police investigation taking place. Additionally, there is no indication that a reasonable person would expect any of the statements made to Jones, Humphries or Crego-Stahl to be used at a trial.
 {¶ 37} As to the statements made to Higgins and Hinojosa, we are also unable to find that A.M. and M.M.'s statements to Higgins and Hinojosa were testimonial. Again, neither Higgins nor Hinojosa are law enforcement personnel, and, at the time the statements were made to them, there was no indication that a police investigation would be pursued. Rather, Higgins and Hinojosa were merely trying to determine why the children were acting in such a strange manner. It was not until after the statements were made that there was any indication that an investigation would be pursued. We are satisfied that under the circumstances, at the time the statements were made, a reasonable person would not be under the assumption that those statements would be available for use at a trial.
 {¶ 38} Having found that hearsay statements testified to by Jones, Higgins, Hinojosa, Humphries and Crego-Stahl were not testimonial, we must next determine whether those statements were properly admitted under the standards set forth in Ohio v.Roberts, 448 U.S. 56. Under the Roberts standard theSixth Amendment right to confrontation does not bar the admission of a witness' statement against a criminal defendant if the statement bears "adequate `indicia of reliability.'" Id. at 66. TheRoberts test is met when the evidence either falls within a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." Id.
 {¶ 39} While the question of whether a criminal defendant's rights under the Confrontation Clause have been violated is generally reviewed de novo, a trial court's decision on the admissibility of specific evidence is not subject to reversal in the absence of an abuse of discretion. State v. Sage (1987),31 Ohio St.3d 173, para. two of the syllabus. An abuse of discretion has been described as a judgment that is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. Thus, we review the trial court's determination of whether this testimony was admissible hearsay under an abuse of discretion standard.
 {¶ 40} Following the hearing on Muttart's motion in limine, the trial court determined that A.M.'s statements to Hinojosa and Higgins were admissible under Evid.R. 803(2), the excited utterance hearsay exception; that A.M.'s statements made to Jones were admissible under Evid.R. 803(4), because such statements were made for the purposes of a medical diagnosis; and, that statements made to Humphries and Crego-Stahl were admissible under Evid.R. 803(4), because those statements were made for the purposes of psychological diagnosis and treatment.
 {¶ 41} Evid.R. 803 provides:
The following are not excluded by the hearsay rule, eventhough the declarant is available as a witness:
* * *
(2) Excited utterance. A statement relating to a startlingevent or condition made while the declarant was under the stressof excitement caused by the event or condition
* * *
(4) Statements for the purposes of medical diagnosis ortreatment. Statements made for the purposes of medical diagnosisor treatment and describing medical history, or past or presentsymptoms, pain, sensations, or the inception or general characterof the cause or external source thereof insofar as reasonablepertinent to diagnosis or treatment.
 {¶ 42} In the case sub judice, the victim, A.M., did not testify, and she was not found to be unavailable. However, as Evid.R. 803 notes, availability of the witness is immaterial. While A.M.'s availability is not at issue for the purposes of the admission of the hearsay statements, A.M.'s competency is at issue.
 {¶ 43} In State v. Said (1994), 71 Ohio St.3d 473, the Ohio Supreme Court determined that before a statement can be admitted as a hearsay exception, it "must meet the same basic requirements for admissibility as live witness testimony." Id. at 475. Under Evid.R. 601, live witness testimony may be admitted only if the witness is competent. Furthermore, while Evid.R. 601 provides that "[e]very person is competent to be a witness," subpart (A) excepts "children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." Thus, the Court in Said held that a child must be found competent at the time a statement is made before the statement can qualify under any hearsay exception. 71 Ohio St.3d at 477.
 {¶ 44} In this case, Muttart raised the issue of A.M.'s competency in his initial motion in limine. Additionally, the issue was addressed at the hearing on that motion. However, as the trial court notes in its judgment entry on Muttart's motion in limine, "the defendant agreed to defer any hearing on the issues surrounding a competency determination as to the testimony of [A.M.], the alleged victim and [M.M.], the alleged victim's brother." Upon review of the entire record, we cannot find that this issue was resolved. Accordingly, in light of Said, we must determine whether the trial court's failure to make a determination as to whether A.M. was competent at the time she made the statements is error.
 {¶ 45} In considering this issue, we must first note that while Said held that a child must be found competent at the time a statement is made before a statement can qualify under any hearsay exception, the Court specifically excepted excited utterances from the general rule. 71 Ohio St.3d at 477; see, also, State v. Wallace (1988), 37 Ohio St.3d 87; State v.Street (1997), 122 Ohio App.3d 79. Thus, so long as the trial court did not abuse its discretion in admitting those statements admitted under the excited utterance exception, the trial court did not err in failing to make a competency determination for those statements brought in through Higgins and Hinojosa.
 {¶ 46} As noted above, an excited utterance is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). The Supreme Court of Ohio has set forth a four-part test for determining what constitutes an "excited utterance":
The excited-utterance exception is essentially a codificationof Ohio common law governing spontaneous exclamations. At commonlaw, this court applied a four-part test in determining whatconstituted a spontaneous exclamation:
 (a) that there was some occurrence startling enough to producea nervous excitement in the declarant, which was sufficient tostill his reflective faculties and thereby make his statementsand declarations the unreflective and sincere expression of hisactual impressions and beliefs, and thus render his statement ordeclaration spontaneous and unreflective,
 (b) that the statement or declaration, even if not strictlycontemporaneous with its exciting cause, was made before therehad been time for such nervous excitement to lose a dominationover his reflective faculties, so that such dominationcontinued to remain sufficient to make his statements anddeclarations the unreflective and sincere expression of hisactual impressions and beliefs,
 (c) that the statement or declaration related to suchstartling occurrence or the circumstances of such startlingoccurrence, and
 (d) that the declarant had an opportunity to observepersonally the matters asserted in his statement or declaration.
 Wallace, 37 Ohio St.3d at 89, citing to Potter v. Baker
(1955), 162 Ohio St. 488, para. two of the syllabus. Additionally, this Court has previously held that "[t]his test has been liberally applied to out-of-court statements made by child declarants who are alleged victims of sexual abuse." Statev. Shoop (1993), 87 Ohio App.3d 467, 472, citing to State v.Wagner (1986), 30 Ohio App.3d 261.
 {¶ 47} In its judgment entry on Muttart's motion in limine, the trial court found that the statements made to Higgins and Hinojosa were admissible as excited utterances. Specifically, the trial court found that:
The evidence before the Court indicates that [A.M.] disclosedthe alleged abuse to her mother and Vicky Higgins through herimaginary friend, Kelly. At the time immediately beforedisclosure, [A.M.] was curled up on the couch, crying, havingdifficulty swallowing, and tapping her teeth. Further, the cryingcontinued through the whole time she was telling her story. WhenVicky Higgins asked [A.M.] why her throat hurt, [A.M.] repliedthat Kelly could tell her, she went to her room, then cameskipping back into the room as "Kelly," who made the disclosureto Vicky Higgins. The three day lapse between the alleged abuse,which occurred between March 18-21, 2003, and the day ofdisclosure, March 24, 2003, did not result in [A.M.] making areflective expression, but [was] the result of continued nervousexcitement.
 {¶ 48} Because the trial court specifically looked at the lapse of time between the alleged abuse and the time of A.M.'s disclosure and found that A.M. was still under the influence of the event, we cannot find that the trial court abused its discretion. The trial court clearly considered the above factors and upon review of the record, the trial court's determination is supported by the evidence presented at the hearing on Muttart's motion in limine. Accordingly, we cannot find that the admission of A.M. and M.M.'s statements through Higgins and Hinojosa were error.
 {¶ 49} Turning to the admission of A.M.'s statements through Jones, Dr. Schlievert, Humphries and Crego-Stahl, the trial court admitted each of these statements under the medical diagnosis exception to the hearsay rule. As noted above, the Supreme Court in Said held that a child must be found competent at the time a statement is made before the statement can qualify under any hearsay exception. 71 Ohio St.3d at 71. While the Supreme Court did recognize an exception to this general rule for excited utterances, no such exception was carved out for other types of hearsay allowed under Evid.R. 803. Nevertheless, several Ohio Appellate Courts addressing this issue have held that a child's statements for the purposes of medical diagnosis or treatment are admissible regardless of the competency of a child. See State v.Rice, 8th Dist. No. 82547, 2005-Ohio-3393, ¶ 17; State v.Brewer, 6th Dist. No. E-01-053, 2003-Ohio-3423; State v.Ashford (Feb. 16, 2001), 11th Dist. No. 99-0015; State v.Wilson (Feb. 18, 2000), 4th Dist. No. 99CA672.
 {¶ 50} While several districts have determined that the competency requirement is no longer mandated for the use of hearsay under Evid.R. 803(4), we cannot find that Supreme Court dispensed with that requirement. Under Said, the only exception specified by the Supreme Court was excited utterances. Accordingly, we find that based upon Said, the trial court was required to determine that A.M. was competent at the time she made her statements to Jones, Humphries and Crego-Stahl, prior to those statements being admitted into evidence. Thus, we find that the trial court erred in admitting those statements without first holding a competency hearing and making specific findings that A.M. was, in fact, competent at the time she spoke with those persons.
 {¶ 51} Having found that the trial court did err in allowing the hearsay testimony of Jones, Humphries and Crego-Stahl without first determining A.M.'s competency at the time the statements were made, we must next determine whether the admission of such testimony was nevertheless harmless. Harmless error is defined as: "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." See Crim.R. 52(A). The Ohio Supreme Court has stated that harmless error is any error that does not affect the outcome of the case and, thus, does not warrant a judgment overturned or set aside. State v.Brown (2003), 100 Ohio St.3d 51.
 {¶ 52} As noted above, Jones, Humphries and Crego-Stahl each testified to statements made by A.M. Jones specifically testified that A.M. told her that "[h]e put this in my mouth," while she was pointing between her legs; that "pee came out of it;" that "he did it more than once;" and that "Dennis put his pee pee in my pee pee." (Tr. pp. 161, 163-64.) Finally, when Jones asked A.M. what it felt like when Dennis put his pee pee in her pee pee, Jones testified that A.M. stated that "it hurtie hurt." (Tr. p. 164.)
 {¶ 53} Humphries testified that A.M. told her that she was afraid of monsters and that she did not want to see her dad anymore. However, Humphries stated that A.M. did not make any specific allegations of abuse. Crego-Stahl specifically testified that "[A.M.] stated Dennis made me suck his pee pee and I tried to get out of the bathroom, but he locked the door and I don't know how." (Tr. pp. 635-636.) Additionally, Crego-Stahl testified that A.M. told her that she was afraid to go to Dennis' house and that Dennis told her that if she didn't keep her secret then her mother would go to jail.
 {¶ 54} Upon review of the specific statements admitted at trial, we find that the statements made by Humphries and Crego-Stahl are harmless. Essentially, both Humphries and Crego-Stahl reiterated the allegations of the oral rape, which were properly before the jury with Higgins and Hinojosa's statements. While this testimony did corroborate A.M.'s earlier statements through Higgins and Hinojosa, we cannot find that such testimony warrants reversal on counts one and two, which involve the oral rape charges.
 {¶ 55} In addition, we find Jones' testimony regarding A.M.'s statements of oral rape to be harmless. However, we find that Jones' testimony regarding A.M.'s statements of vaginal rape do rise to the level of reversible error. Essentially, upon review of the entire record, there is no other evidence anywhere regarding the vaginal rape charge. Accordingly, because there was no other evidence of the vaginal rape, Muttart's conviction for count three must be reversed.
 {¶ 56} Having found that there is reversible error as to count three, Muttart's first assignment of error is sustained in part and overruled in part.
 Assignment of Error No. II {¶ 57} In the second assignment of error, Muttart contends that the trial court erred by imposing consecutive sentences. Specifically, he asserts that the trial court failed to make the required statutory findings necessary to impose consecutive sentences and that the trial court's findings are not supported by the record.
 {¶ 58} The Supreme Court of Ohio recently addressed constitutional issues concerning felony sentencing in State v.Foster, 109 St.3d 1, 2006-Ohio-856. In Foster, the Supreme Court of Ohio held that portions of Ohio's felony sentencing framework are unconstitutional and void, including R.C.2929.14(E)(4), which require judicial findings to impose consecutive terms. 2006-Ohio-856, at ¶¶ 65-67. Pursuant to the ruling of the Ohio Supreme Court in Foster, we find that Muttart's sentence is void as being based upon unconstitutional statutes. Thus, the second assignment of error is sustained.
 Assignment of Error No. III {¶ 59} In the third assignment of error, Muttart contends that the trial court erred in ordering restitution, because the court failed to consider Muttart's ability to pay such restitution. It is well-established that a trial court speaks only through its journal entries. See, e.g., State ex rel.Geauga Cty. Bd. Of Commrs. V. Mulligan, 100 Ohio St.3d 366, at ¶ 20, citation omitted. Although the trial court stated its intention to impose restitution at the time of the sentencing hearing, no restitution was specified in the final judgment entry. Accordingly, no restitution was actually imposed. Thus, Muttart's third assignment of error is moot.
 {¶ 60} Having found error prejudicial to Appellant herein, in the particulars assigned and argued, we reverse the judgment of the trial court as to Muttart's conviction for count three and affirm his convictions as to counts one and two. Additionally, we vacate the judgment of the trial court as to Muttart's sentence and remand for further proceedings consistent with this opinion.
Judgment affirmed in part, reversed in part and causeremanded.
 Cupp J., concurs.
 Shaw, J., concurs in judgment only.