THE STATE OF OHIO, APPELLANT AND CROSS-APPELLEE,
*v*. MUTTART, APPELLEE AND CROSS-APPELLANT.

[Cite as *State v. Muttart,* 116 Ohio St.3d 5, 2007-Ohio-5267.]

(Nos. 2006–1293 and 2006–1488—Submitted May
23, 2007—Decided October 11, 2007.)

O'CONNOR, J.

{¶ 1} After trial by jury, appellee and cross-appellant, Dennis Muttart, was convicted of three counts of raping a child under 13 years of age in violation of R.C. 2907.02(A)(1)(b). He was sentenced to three consecutive terms of life imprisonment. On appeal, two of the convictions were affirmed, and one was reversed.

{¶ 2} Upon review, we recognized a conflict among the courts of appeals, 111 Ohio St.3d 1408, 2006-Ohio-5083, 854 N.E.2d 1089, and asserted discretionary jurisdiction over an appeal by the state and a cross-appeal by Muttart, 111 Ohio St.3d 1411, 2006-Ohio-5083, 854 N.E.2d 1091, and 111 Ohio St.3d 1496, 2006-Ohio-6250, 857 N.E.2d 1232. We consolidated the appeals and now address two issues: whether a child's out-of-court statements to medical personnel are admissible pursuant to Evid.R. 803(4) in the absence of a judicial determination of the competency of the child as a witness and whether the admission of those hearsay statements violated appellant's Sixth Amendment rights of confrontation as those rights were recognized in *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177.

6

{¶ 3} We conclude that the child victim's statements were properly admitted, even in the absence of a competency hearing, and that their admission did not offend the Confrontation Clause. We therefore affirm Muttart's convictions.

## Relevant Background

{¶ 4} On March 21, 2003, Muttart's former wife, Angela Hinojosa, noticed unusual behavior in her young children, daughter A.M., then four and a half years old, and son M.M., then almost six years old. The children had just returned to her home from a three-day visit with their father, Muttart, at Muttart's mother's home in Findlay.[1]

{¶ 5} Upon the children's return home on March 21, 2003, Hinojosa was concerned that M.M. was having a panic attack. Hinojosa also noticed that A.M. was acting very nervous when she returned from the visit with her father and that she had come home with her imaginary friend, "Kelly." At the time, however, Hinojosa was focused primarily on M.M.'s behavior because she feared that he was exhibiting symptoms of an anxiety disorder, from which she and other members of her family suffered.

{¶ 6} After calling Muttart to inquire whether anything unusual had happened during the visit and being told that nothing had, Hinojosa contacted her children's doctor, Dr. Donald Johnson, on Monday, March 24. She scheduled an appointment for M.M. to see Johnson the following day.

{¶ 7} Elizabeth McQuistion, a former neighbor and friend of Hinojosa's, happened to visit Hinojosa on Monday afternoon. Hinojosa expressed concern about M.M.'s behavior to McQuistion. She mentioned that A.M. was starting to have Kelly present more often.

{¶ 8} During this conversation with McQuistion, Hinojosa also recalled that at least six months earlier her children had said they had a "big secret"—and made an accusation that Muttart had made A.M. "suck his pee pee." Hinojosa testified that she had telephoned Muttart at the time of the children's prior statement and that he had denied the accusation. Hinojosa testified that although she had spoken with a local police officer about the children's statements, she was referred to police in the town in Michigan in which Muttart lived. Hinojosa testified that she had called the police in Michigan but that her call was not returned. It does not appear that Hinojosa took any additional action at that time in response to the children's disclosures.

---

1. After their divorce, Hinojosa had custody of A.M. and M.M., and Muttart, who had moved to Michigan, had regular visitation with the children. Hinojosa and Muttart maintained an amicable relationship with respect to their children, and visitation was allowed freely. Muttart would travel from his residence to Findlay to take the children for visits at his home in Michigan, or at the homes of his mother and brother, both of whom lived in Findlay.

{¶ 9} After her conversation with Hinojosa, McQuistion left Hinojosa's house "very shaken up" but returned later that evening with Vickie Higgins, a friend of McQuistion's whom Hinojosa had never met. The three women sat in the living room with A.M., and Hinojosa asked A.M. to tell Higgins about Kelly. According to Hinojosa's testimony, A.M.'s behavior changed; she "got weird," appeared "very, very scared," curled into a fetal position on the couch, and started to cry, saying that she could not tell anyone who Kelly was.

{¶ 10} Higgins asked A.M. who Kelly was; A.M. told Higgins that Kelly was an imaginary friend who went with her to "Daddy Dennis's house." A.M. also stated to Higgins that she could not tell the secret but that Kelly could.

{¶ 11} A.M., acting as if she were Kelly, then pointed repeatedly to her teeth and throat, tapped her teeth, and made a "horrible throat sound like she couldn't swallow," according to Hinojosa's testimony. She then said that the secret was that "Daddy Dennis made her suck his pee pee in the bathroom at Grandma Judy's."

{¶ 12} Higgins called the police from Hinojosa's home, and an officer from the Findlay Police Department soon arrived. After the officer, Higgins, and McQuistion left the home, in response to a subsequent inquiry by her mother, A.M. stated that similar sexual conduct happened every time she went to see Daddy Dennis. A.M. also said that Muttart promised her a Barbie doll if she did not disclose the abuse and that if she told her mother or grandmothers, her mother would be taken to jail.[2]

{¶ 13} Hinojosa testified that she found the March disclosure by A.M. to be more credible than the prior one because A.M. was older and could describe the incidents in greater detail. She also claimed that in a phone call to Muttart after the police had left her home, Muttart eventually admitted that the allegations were true.

{¶ 14} Concerned that A.M. might have contracted a sexually transmitted disease from Muttart, Hinojosa took A.M. to the appointment she had scheduled previously for M.M. Dr. Johnson performed medical tests to determine whether A.M. had contracted any infection or disease but, lacking expertise in the area of child sexual abuse, also referred Hinojosa to Dr. Randal Schlievert, a specialist in the treatment of sexually abused children in the Child Maltreatment Clinic at Mercy Children's Hospital in Toledo.

{¶ 15} On April 14, 2003, A.M. was seen in the clinic. Initially, Julie Jones, a social worker and the assistant director of the child-abuse program, met with A.M. and took her to an examination room. Jones then explained to A.M. that

---

2. At the time of A.M.'s disclosure, Hinojosa knew that she would likely be incarcerated for theft and passing bad checks. The following month, she was incarcerated.

she would be examined by Schlievert and that the doctor "was going to check her body from head to toe and make sure that all parts of her body were okay." Jones also collected a social and medical history from her, an important step in preparing for Schlievert's examination.

{¶ 16} According to Jones's testimony at a pretrial hearing, A.M. told Jones that she knew she was in a "kid's room hospital." During the interview, A.M. disclosed to Jones, by pointing to her genital area, that Muttart put "this" in her mouth and that "pee came out of it." She also stated that Muttart had "put his pee pee in her pee pee" and that it "hurtie, hurt." A.M. stated to Jones that similar conduct had happened "a whole bunch of times" at her paternal grand-mother's home and in Michigan and that she had "tried to get out of the bathroom but he locked the door." Further, A.M. reported that Muttart "would always say that he would get me a Barbie and he didn't."

{¶ 17} Consistent with her practice, Jones informed Dr. Schlievert of A.M.'s statements. A physical examination revealed no signs of abnormality in A.M.'s external genitalia, and additional tests for sexually transmitted diseases were negative. Dr. Schlievert's impression, however, was that "the overall evaluation indicates that she was a sexually abused child." In reaching that conclusion, Dr. Schlievert noted in his report, "The details of [A.M.'s] disclosure (including locking the bathroom door, promising gifts, and description of apparent ejacula-tion) indicate that she experienced the acts." Finally, he stated, "[A.M.] should be afforded complete protection from the alleged perpetrator. In addition, counseling for [A.M.] and her mother is encouraged."

{¶ 18} In June 2003, Hinojosa's mother took A.M. to the Family Resource Center in Findlay for psychotherapy. Betty Humphries, a clinical counselor and therapist, interviewed A.M. to obtain a social history that would be used for diagnostic and therapeutic purposes. A.M. did not allege abuse to Humphries in that interview but reported that she was afraid of monsters and did not want to see Muttart.

{¶ 19} During subsequent play therapy with Connie Crego–Stahl, another clinical counselor and therapist at the Family Resource Center, A.M. eventually told her that she had a secret; thereafter, she told her the secret: "Dennis made me suck his pee pee, and I tried to get out of the bathroom, but he locked the door and I don't know how." Additionally, A.M. told Crego–Stahl that she was afraid to go to Muttart's house and that Muttart told her that if she did not keep the behavior secret, her mother would go to jail. Crego–Stahl eventually concluded that A.M. suffered from posttraumatic stress disorder that had been caused by sexual abuse.

{¶ 20} In October 2003, Muttart was indicted on three counts of rape of a child less than 13 years of age, with a penalty specification that the victim was also

under ten years old. See R.C. 2902.02(A)(1)(b) and (B). The jury was instructed that the first two counts were based on the allegations of oral rape and the third was for vaginal rape.

{¶ 21} Muttart subsequently moved to preclude the state from introducing any hearsay testimony concerning statements made by A.M. or M.M. to third parties. In so doing, Muttart argued that all hearsay statements by A.M. should be excluded because those statements did not fall within any of the hearsay exceptions. An extensive hearing was held on the motion.

{¶ 22} The trial court excluded all hearsay statements made by A.M. to all law-enforcement officers and allowed the motion to that extent. It denied the motion otherwise.

{¶ 23} The court found that A.M.'s statements to Hinojosa and Higgins were excited utterances, see Evid.R. 803(2), and denied the motion in limine as to them on that basis. The court also concluded that A.M.'s statements to Jones, Humphries, and Crego–Stahl were admissible as statements made for the purposes of a medical diagnosis. See Evid.R. 803(4). In addition, the trial court found that Muttart's right to confrontation as explained by *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, would not be violated, because A.M.'s statements to Hinojosa, Higgins, Jones, Humphries, and Crego–Stahl were nontestimonial statements that fell within firmly rooted hearsay exceptions.

{¶ 24} After a trial in August 2004 at which the hearsay statements were admitted over objection, a jury convicted Muttart on all counts. Muttart appealed. The Third District Court of Appeals affirmed in part and reversed in part.

{¶ 25} In addressing Muttart's claims of a *Crawford* violation, the court found that the hearsay statements repeated by Jones, Higgins, Hinojosa, Humphries, and Crego–Stahl were not testimonial in nature and that no *Crawford* violation arose. 2006-Ohio-2506, 2006 WL 1381638, ¶ 35. It then turned to whether the hearsay evidence was sufficiently reliable for admission, as required by *Ohio v. Roberts* (1980), 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597. See *Crawford,* 541 U.S. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 26} In addressing the reliability of the hearsay evidence admitted at trial, the court of appeals applied our holding in *State v. Said* (1994), 71 Ohio St.3d 473, 644 N.E.2d 337. The court readily found that the admission of the excited utterances A.M. made to Hinojosa and Higgins was proper. 2006-Ohio-2506, 2006 WL 1381638, ¶ 48.

{¶ 27} The court then turned to the question of whether the statements to Jones, Humphries, and Crego–Stahl were admissible under the medical-treatment hearsay exception of Evid.R. 803(4). The appellate court recognized that

several courts of appeals had found that similar hearsay statements were admissible under the medical-treatment exception even without a competency finding. 2006-Ohio-2506, ¶ 48. It concluded, however, that *Said* required that the trial court must first determine that A.M. was competent at the time she made the statements to Jones, Humphries, and Crego–Stahl before those statements could be admitted. 2006-Ohio-2506, 2006 WL 1381638, ¶ 50.

{¶ 28} Notwithstanding its conclusion that the trial court erred in admitting the hearsay statements, the court of appeals concluded that the error was harmless with respect to testimony referring to oral rape. Id. at ¶ 54–55. That finding was based on the conclusion that the trial court had properly admitted similar testimony by Hinojosa and Higgins on the basis of A.M.'s excited utterances to them and, therefore, that any error in the admission of the testimony of Jones, Humphries, and Crego–Stahl was harmless. 2006-Ohio-2506, 2006 WL 1381638, ¶ 54.

{¶ 29} The court of appeals, however, found that Jones's testimony that A.M. reported that Muttart had "put his pee pee in her pee pee" was the only evidence in the record to support the vaginal-rape charge, id. at ¶ 55, and therefore, that the improper admission of that evidence was not harmless. Accordingly, it reversed the conviction for vaginal rape. Id.

{¶ 30} In its appeal to this court, the state argues that the trial court properly admitted the hearsay testimony of the medical and psychological caregivers to whom A.M. disclosed the abuse. Muttart's cross-appeal asserts that a child victim under the age of ten years must undergo a competency evaluation prior to admission of her hearsay declarations and that his confrontation rights under the Sixth Amendment were violated by the admission of that testimony. We now turn to these claims, as well as to the certified conflict.

## ANALYSIS

### A

{¶ 31} Our evidentiary rules provide generally that "[e]very person is competent to be a witness," but exceptions to that rule exist, including one for "children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." Evid.R. 601(A).

{¶ 32} In *Said,* we stated that "[a] competency hearing is an indispensable tool" and that "[a] court cannot determine the competency of a child through consideration of the child's out-of-court statements standing alone." 71 Ohio St.3d at 476, 644 N.E.2d 337. Citing our prior decision in *State v. Wilson* (1952), 156 Ohio St. 525, 532, 46 O.O 437, 103 N.E.2d 552, we reiterated that "the essential questions of competency can be answered only through an in-person

hearing" in which the court can consider the child's appearance, fear, composure, general demeanor and manner of answering. Id.

{¶ 33} In his appeal, Muttart relies heavily on *Said* and our prior decision in *State v. Boston* (1989), 46 Ohio St.3d 108, 545 N.E.2d 1220, to support his contention that the trial court erroneously admitted witnesses' hearsay testimony about A.M.'s disclosures to them. More specifically, he argues that the hearsay testimony could not be admitted because the trial court had not determined that A.M. was competent at the time she made the statements.

{¶ 34} *Said* addressed the hearsay exception set forth in Evid.R. 807, which was then a new hearsay exception in Ohio, see 71 Ohio St.3d at 474, 644 N.E.2d 337, that was created specifically in response to our splintered decision in *Boston* and the increasing number of court cases involving child sexual abuse. See *State v. Dever* (1992), 64 Ohio St.3d 401, 408, 596 N.E.2d 436, fn. 5. In *Boston,* the lead opinion rejected the federal courts' expansive reading of the federal counterpart to Evid.R. 803(4) in favor of a narrower approach based on Ohio's common law. See Evid.R. 102; 46 Ohio St.3d at 116–117, 545 N.E.2d 1220. At common law, the exception was based largely on the "selfish-motive doctrine," i.e., the belief that the declarant is motivated to speak truthfully to a physician because of the patient's self-interest in obtaining an accurate diagnosis and effective treatment. See *State v. Eastham* (1988), 39 Ohio St.3d 307, 312, 530 N.E.2d 409 (Brown, J., concurring).

{¶ 35} The lead opinion's emphasis on the common law in *Boston* was not wholly improper, but it was overly formulaic. Moreover, the dicta assuming that a child is not motivated to give a physician truthful information and thus that the child's statements did not satisfy the common-law understanding that underlies Evid.R. 803(4)[3] drew strong criticism from other courts. See, e.g., *In re Dependency of M.P.* (1994), 76 Wash.App. 87, 882 P.2d 1180. Shortly after we decided *Boston,* we modified its holding in *Dever,*[4] see 64 Ohio St.3d at 408, 596 N.E.2d 436, a case in which we found no abuse of discretion in a trial judge's decision to permit a physician to testify as to similar hearsay statements that had been disclosed to her by a four-year-old girl who had been sexually abused by her father. 64 Ohio St.3d at 412–413, 596 N.E.2d 436.

---

3. "Of course, none of the courts pause to indicate how * * * children of very tender years can be considered to be giving a medical professional specific symptoms and complaints to assist in diagnosis or treatment. The reason is obvious—as is the dilemma. The reason is that we really know that such a young child is not giving the doctor the information for the purposes required by Evid.R. 803(4). More than likely, the child does not even want to be seeing the doctor!" *Boston,* 46 Ohio St.3d at 122, 545 N.E.2d 1220.

4. *Dever* predates our decision in *Westfield Ins. Co. v. Galatis,* 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, in which this court first enunciated our standard for overruling precedent.

{¶ 36} In *Dever,* we recognized that our assumption about children's veracity with physicians was too broadly asserted and that we also had read too rigid a motivational requirement into Evid.R. 803(4). Id. at 409, 596 N.E.2d 436. In so doing, we noted that the common-law basis for the medical-treatment exception was not as specific as *Boston* had found, "at least where young children are concerned." Id. at 410, 596 N.E.2d 436. Noting that the practical result of *Boston* was the exclusion of a child's statements in virtually all cases, we found that Evid.R. 102 did not require such "a sweeping result." Id. at 409, 596 N.E.2d 436.

{¶ 37} Importantly for purposes here, in *Dever* we also explained the fundamental differences between Evid.R. 807 and Evid.R. 803(4). "The test contained in Evid.R. 807 has a purpose different from the test discussed here [for Evid.R. 803(4) ]. Evid.R. 807's 'totality of the circumstances' test is designed specifically with the Confrontation Clause requirements in mind. See Staff Notes to Evid.R. 807. On the other hand, the test under 803(4) goes solely to whether the statement was made for purposes of medical diagnosis or treatment. If a statement *is* made for purposes of diagnosis or treatment, it is admissible pursuant to Evid.R. 803(4)." (Emphasis added.) 64 Ohio St.3d at 414, 596 N.E.2d 436.

{¶ 38} In light of the many questions about the reliability of child victims' statements of sexual abuse that were part of the zeitgeist at the time Evid.R. 807 was adopted, it is not surprising that admissibility of hearsay statements based on that rule requires a threshold demonstration of reliability. And there can be no doubt that the drafters of Evid.R. 807 believed that the hearsay excepted in Evid.R. 803 was more reliable than the hearsay at issue in Evid.R. 807 because the plain text of Evid.R. 807 acknowledges that other hearsay is more reliable. See Evid.R. 807(A)(1) (stating that admissibility under Evid.R. 807 depends in part on a showing that "the totality of the circumstances surrounding the making of the statement provides particularized guarantees of trustworthiness that make the statement *at least as reliable as statements admitted pursuant to Evid.R. 803 and 804* " [emphasis added]).

{¶ 39} As noted earlier, a fundamental assumption underlying the medical-treatment exception is that that particular hearsay is reliable. *Dever,* 64 Ohio St.3d at 410–411, 596 N.E.2d 436. "[The] exception is premised on the theory that a patient's statements to her physician are likely to be particularly reliable," *United States v. Tome* (C.A.10, 1995), 61 F.3d 1446, 1449, and "carr[y] special guarantees of credibility," *White v. Illinois* (1992), 502 U.S. 346, 356, 112 S.Ct. 736, 116 L.Ed.2d 848.

{¶ 40} But the presumption of reliability in the medical hearsay exception is not based exclusively on the selfish-motive doctrine. It is also premised on the professional-reliance factor.

{¶ 41} " 'The general reliance upon "subjective" facts by the medical profession and the ability of its members to evaluate the accuracy of statements made to them is considered sufficient protection against contrived symptoms.  Within the medical profession, the analysis of the rule appears to be that facts reliable enough to be relied on in reaching a diagnosis have sufficient trustworthiness to satisfy hearsay concerns.' " *Dever*, 64 Ohio St.3d at 411, 596 N.E.2d 436, quoting 2 McCormick on Evidence (4th Ed.1992) 250.  Other appellate courts also recognize the inherent reliability of a statement that is reliable enough to serve as a basis for medical diagnosis, id., citing *United States v. Renville* (C.A.8, 1985), 779 F.2d 430, 436, finding that "physicians, by virtue of their training and experience, are quite competent to determine whether particular information given to them in the course of a professional evaluation is 'reasonably pertinent to diagnosis or treatment,' and are not prone to rely upon inaccurate or false data in making a diagnosis or in prescribing a course of treatment." *King v. People* (Colo.1990), 785 P.2d 596, 602.  We believe that the secondary rationale of professional reliance is of great import in abuse cases.

{¶ 42} We are aware, of course, of the possibility that parents of abused children may give false information to a physician, including denials or deliberate misidentifications, see *United States v. Yazzie* (C.A.9, 1995), 59 F.3d 807, 813, and that a victim might deny abuse to the physician, particularly when in the company of the abuser.  Such falsehoods may be a survival strategy or may reflect a complex psychodynamic or phenomena that untrained persons may not understand fully.  Although physicians and psychotherapists are not infallible when diagnosing abuse, we believe that their education, training, experience, and expertise make them at least as well equipped as judges to detect and consider those possibilities.  Accord *Dever*, supra; cf.  *Parham v. J.R.* (1979), 442 U.S. 584, 609, 99 S.Ct. 2493, 61 L.Ed.2d 101.

{¶ 43} Given these strong indicia of reliability in the medical-treatment hearsay at issue in this case, and our evisceration of *Boston* in *Dever*, Muttart's reliance on *Boston* undermines his argument.

{¶ 44} Similarly, Muttart's reliance on *Said* is misplaced.  Although *Said* held that Evid.R. 807 did not eliminate the need for a competency determination for the hearsay statements of a child declarant proffered under that exception, *Said* did not establish a blanket rule requiring a competency determination for admissibility under other hearsay exceptions.  In fact, in *Said* we expressly stated that "a trial court must find that a declarant under the age of ten was competent at the time she made the statement *in order to admit that statement under Evid.R. 807.*"  (Emphasis added.)  71 Ohio St.3d at 477, 644 N.E.2d 337. The rule in *Said* is thus far narrower than Muttart recognizes.

{¶ 45} Moreover, *Said* specifically noted that another hearsay exception, for excited utterances, did not require a competency hearing, because "the circumstances involving an excited utterance make that exception *sui generis* with respect to requiring competency of a child declarant." Id., fn. 1, citing *State v. Wallace* (1988), 37 Ohio St.3d 87, 94–95, 524 N.E.2d 466. Similar to the excited-utterance exception, the medical-treatment exception has inherent reliability that is not extant in Evid.R. 807.

{¶ 46} Clearly, neither *Boston* nor *Said* nor Evid.R. 807 controls the admission of evidence proffered per Evid.R. 803(4).[5] We hold that regardless of whether a child less than ten years old has been determined to be competent to testify pursuant to Evid.R. 601, the child's statements may be admitted at trial as an exception to the hearsay rule pursuant to Evid.R. 803(4) if they were made for purposes of medical diagnosis or treatment. *Ferrell v. Ferrell* (Mar. 14, 1986), Huron App. No. H–84–39, 1986 WL 3252, *3.

{¶ 47} In cases in which a statement was made for purposes of medical diagnosis or treatment, the question is not whether the statement is reliable; the presumption is that it is. The salient inquiry here is not A.M.'s competency but whether her statements were made for purposes of diagnosis and treatment rather than for some other purpose.

{¶ 48} Although certain questions may arise in attempting "to apply to children evidentiary rules which were drafted with adults in mind," see *Dever*, 64 Ohio St.3d at 404, 596 N.E.2d 436, we believe those questions can be addressed by the trial court, which retains the discretion to admit the testimony after considering the circumstances surrounding a child victim's statements. Accord *State v. Vaught* (2004), 268 Neb. 316, 682 N.W.2d 284, a case we cited approvingly in our recent decision in *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, ¶ 26.

{¶ 49} The trial court's considerations of the purpose of the child's statements will depend on the facts of the particular case. At a minimum, we believe that a nonexhaustive list of considerations includes (1) whether the child was questioned in a leading or suggestive manner, see, e.g., *Dever*, 64 Ohio St.3d at 410, 596 N.E.2d 436, citing *Idaho v. Wright* (1990), 497 U.S. 805, 110 S.Ct. 3139, 111

---

5. Our analysis is not altered by the court's decision in *State v. Storch* (1993), 66 Ohio St.3d 280, 612 N.E.2d 305, which addressed the constitutionality of Evid.R. 807 under the federal and Ohio Constitutions, and Muttart does not rely on it here. And although *In re Coy* (1993), 67 Ohio St.3d 215, 616 N.E.2d 1105, held that Evid.R. 807 should be used by trial courts in determining the admissibility of out-of-court statements of a child under the age of 12 years concerning child abuse, *In re Coy* did not present hearsay statements made to medical personnel or alter our holding in *Dever*. In cases in which there is hearsay that could be admitted under Evid.R. 807 or Evid.R. 803(4), the trial court judge retains her discretion to determine which hearsay exception, if any, is most appropriate to admit the evidence. *Dever*, 64 Ohio St.3d at 414, 596 N.E.2d 436.

L.Ed.2d 638; (2) whether there is a motive to fabricate, such as a pending legal proceeding such as a "bitter custody battle," id., citing *Boston,* 46 Ohio St.3d at 108, 545 N.E.2d 1220; and (3) whether the child understood the need to tell the physician the truth, id., citing *People v. Meeboer* (1992), 439 Mich. 310, 322–323, 484 N.W.2d 621. In addition, the court may be guided by the age of the child making the statements,[6] which might suggest the absence or presence of an ability to fabricate, and the consistency of her declarations. *Broderick v. King's Way Assembly of God Church* (Alaska 1991), 808 P.2d 1211, 1219–1220. In addition, the court should be aware of the manner in which a physician or other medical provider elicited or pursued a disclosure of abuse by a child victim, as shown by evidence of the proper protocol for interviewing children alleging sexual abuse. *State v. Gersin* (1996), 76 Ohio St.3d 491, 668 N.E.2d 486.

{¶ 50} A defendant remains free to attack testifying witnesses' veracity and recollection, and a jury too can assess those claims and determine what weight, if any, to give to the witnesses' testimony. *Dever,* supra; *United States v. George* (C.A.9, 1992), 960 F.2d 97, 100.

{¶ 51} We now consider the evidence in light of the test described.

{¶ 52} There is no suggestion before us that A.M. was not generally truthful. To the contrary, police reports indicated that Muttart told investigating officers that he believed her to be a truthful child generally. When asked about those statements at trial, Muttart testified that he did not think that A.M. could make up the allegations by herself, and implied that "there's a possibility of coaching going on." Although we are aware of the possibility of coaching a child to make untruthful allegations, the record here does not suggest a motive for fabrication or otherwise support Muttart's speculation about the possibility that A.M. was being directed to make untruthful allegations.

{¶ 53} Whatever differences and disagreements existed between Muttart and Hinojosa during their marriage, at the time of A.M.'s disclosures, there were no pending legal matters with respect to divorce, custody, or visitation. In fact, the parties appear to have amicably resolved custody and visitation issues.

---

6. In *Wallace,* we noted that excited utterances were deemed reliable because, by their nature, they do not entail an opportunity for the declarant to reflect and fabricate or to distort the truth. 37 Ohio St.3d at 88, 524 N.E.2d 466. Other courts have found that a child's young age and naiveté may themselves be factors in favor of trustworthiness, see, e.g., *People v. Meeboer* (1992), 439 Mich. 310, 326–327, 484 N.W.2d 621; *Broderick v. King's Way Assembly of God Church* (Alaska 1991), 808 P.2d 1211, 1219, and cases cited therein, and that even very young children have a strong motive to make truthful statements for purposes of diagnosis and treatment, see, e.g., *Tome,* 61 F.3d at 1450–1451, 1458–1459 (permitting a physician to testify to the hearsay statements of a child victim who had just turned five years old, even in the absence of any determination of the child's ability to tell the truth); *Morgan v. Foretich* (C.A.4, 1988), 846 F.2d, 941, 949 (a case in which the child victim declarant was four years old).

{¶ 54} Moreover, Hinojosa did not aggressively pursue A.M.'s prior allegation of sexual abuse. Although we do not condone her inaction, we do see it as some evidence that Hinojosa was not fostering A.M.'s allegations or using them to her advantage.

{¶ 55} Finally, evidence suggested that A.M. knew she was in a medical setting at the time she disclosed information about Muttart to Jones, and there is no evidence that Jones solicited the disclosures in a leading manner. Schlievert, an expert in child abuse, relied heavily on those statements in diagnosing A.M. and in referring her for treatment. And despite the passage of time, A.M.'s subsequent statements to Crego–Stahl were consistent with those at the time of initial disclosure to her mother.

{¶ 56} Applying the totality test here, we are satisfied that the trial court did not abuse its discretion in finding that A.M.'s hearsay statements were made for purposes of medical diagnosis and treatment and thus sufficiently reliable to be admitted through the testimony of Jones, Humphries, and Crego–Stahl. We therefore reverse the court of appeals' decision to the extent that it found error in the admission of hearsay evidence about A.M.'s disclosures to medical providers pursuant to Evid.R. 803(4).

**B**

{¶ 57} We turn now to Muttart's claim that the rights conferred by the Sixth Amendment to the United States Constitution were violated in this case.

{¶ 58} The Sixth Amendment gives the defendant in any criminal prosecution the right to confront witnesses against him. Prior to 2004, the United States Supreme Court had interpreted the Confrontation Clause to permit the state to use hearsay statements of a declarant who was not available at trial if the hearsay fell within "a firmly rooted hearsay exception" or if it otherwise bore "particularized guarantees of trustworthiness." See, e.g., *Ohio v. Roberts,* 448 U.S. at 66, 100 S.Ct. 2531, 65 L.Ed.2d 597. In *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, however, the court recognized that that interpretation of the Sixth Amendment in *Roberts* was inconsistent with the historical principles behind the Confrontation Clause. It held that the Sixth Amendment "commands, not that [hearsay] evidence be reliable, but that the reliability be assessed in a particular manner: by testing in the crucible of cross-examination." 541 U.S. at 61, 124 S.Ct. 1354, 158 L.Ed.2d 177. It thus concluded that if the statement proffered is testimonial in nature, it must be subjected to cross-examination regardless of its reliability. Id. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 59} In order for *Crawford* to apply to A.M.'s statements as Muttart contends, we must necessarily find that her statements were testimonial, because

the Confrontation Clause applies only to testimonial statements. *Stahl,* 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, ¶ 15. " 'Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts,* and as would an approach that exempted such statements from Confrontation Clause scrutiny all together.' " Id. at ¶ 16, quoting *Crawford,* 541 U.S. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177; see also *Davis v. Washington* (2006), 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224. In fact, in the wake of *Davis* there is a significant question about whether the Confrontation Clause analysis applies to nontestimonial statements. See, e.g., *United States v. Feliz* (C.A.2, 2006), 467 F.3d 227, 231, citing *Davis,* 547 U.S. at 823–824, 126 S.Ct. at 2274, 165 L.Ed.2d 224.

{¶ 60} The Supreme Court has not defined what constitutes a "testimonial" statement, but it has given three examples of "formulations" for "testimonial statements": all ex parte in-court testimony or its functional equivalent; extrajudicial statements contained in formalized testimonial materials (e.g., affidavits, depositions, prior testimony, confessions); and a class of statements that are made " " "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." ' " *Stahl* at ¶ 19, quoting *Crawford v. Washington,* 541 U.S. at 51–52, 124 S.Ct. 1354, 158 L.Ed.2d 177, quoting the brief of amicus curiae National Association of Criminal Defense Lawyers. In considering whether statements implicate Confrontation Clause analysis, we are to view them objectively. Id. at ¶ 22, citing *Davis,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224; id. at ¶ 36.

{¶ 61} Here, we have no concern that the statements at issue were testimonial in nature. The statements made by A.M. were not made in the context of in-court testimony or its equivalent. There is no suggestion that they were elicited as part of the police investigation or in a sworn statement with intention of preserving the statement for trial or that they were a pretext or façade for state action. To the contrary, the initial statements made to Hinojosa, McQuistion, and Higgins were deemed to be excited utterances, and the statements to Jones and Crego–Stahl are not shown to have been fostered by the state rather than by Hinojosa acting in furtherance of medical diagnosis and treatment on behalf of A.M.

{¶ 62} The facts here suggest strongly that Hinojosa's initial and primary concern was the physical well-being of her children. The appointment with Schlievert was a referral from Johnson for medical diagnosis and treatment, and his referral to Humphries and Crego–Stahl was for therapeutic rather than prosecutorial purposes. The fact that the information gathered by the medical personnel in this case was subsequently used by the state does not change the fact that the statements were not made for the state's use.

{¶ 63} Statements made to medical personnel for purposes of diagnosis or treatment are not inadmissible under *Crawford*, because they are not even remotely related to the evils that the Confrontation Clause was designed to avoid. See, e.g., *People v. Cage* (2007), 40 Cal.4th 965, 991, 56 Cal.Rptr.3d 789, 155 P.3d 205. Because we find no indicia that the statements here were testimonial, Muttart's claim per *Crawford* fails. *Stahl*, supra; see also id., 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, ¶ 56 (Lanzinger, J., dissenting); *Vaught*, supra; *Commonwealth v. DeOliveira* (2006), 447 Mass. 56, 849 N.E.2d 218; *People v. Vigil* (Colo.2006), 127 P.3d 916, 926; *Feliz*, supra.

{¶ 64} The statements made by A.M. were admitted properly through the exceptions provided by Evid.R. 803(4), which specifically state that unavailability is irrelevant to the question of admissibility. The evidence here is thus in accordance in with our law and proper under *Crawford*.

{¶ 65} To the extent that the court of appeals rejected Muttart's claim of a *Crawford* violation, we affirm that portion of its judgment.

Judgment reversed in part
and affirmed in part.

MOYER, C.J., and LUNDBERG STRATTON, O'DONNELL, POWELL, and WHITMORE, JJ., concur.

PFEIFER, J., concurs in judgment only.

STEPHEN W. POWELL, J., of the Twelfth Appellate District, sitting for LANZINGER, J.

BETH WHITMORE, J., of the Ninth Appellate District, sitting for CUPP, J.

---

Robert A. Fry, Hancock County Prosecuting Attorney, and Mark C. Miller, Assistant Prosecuting Attorney, for appellant and cross-appellee.

Maria Santo, for appellee and cross-appellant.

Laura A. Perkovic, urging affirmance on behalf of amicus curiae Ohio Association of Criminal Defense Lawyers.

Davis & Young, Richard M. Garner, and Beverly A. Adams, for amicus curiae TIG Insurance Company.