[Cite as *In re J.C.*, 2016-Ohio-3369.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

In re J.C.

Court of Appeals Nos.  OT-15-030
OT-15-031

Trial Court Nos.  21420257
21420258

**DECISION AND JUDGMENT**

Decided:  June 10, 2016

* * * * *

Mark E. Mulligan, Ottawa County Prosecuting Attorney, and
Emily M. Gerber, Assistant Prosecuting Attorney, for appellee.

Amanda A. Krzystan, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1}  This is a consolidated appeal from the judgment of the Ottawa County

Court of Common Pleas, Juvenile Division, finding appellant, J.C., to be delinquent for

committing rape in violation of R.C. 2907.02(A)(1)(b) and 2907.02(A)(2), felonies of the first degree if committed by an adult. For the reasons that follow, we affirm.

{¶ 2} The testimony and evidence from the trial reveal the following. Appellant, 14 years old at the time, was friends with the victim's brother. On or about July 15, 2014, appellant was at the victim's family's house, inside the garage, where there was a television, video game system, couch, table, and chairs. The victim, who was 10 years old at the time of the incident, stated that she was watching the movie Madagascar 3 along with her brother, her older sister, and appellant. She testified that her brother then left to go to a friend's house, and her sister also left. Appellant remained, and the victim testified that he was playing on his phone, watching sex videos. The victim remembered that the phone was black. Appellant told the victim to come sit by him on the couch, and she did, at which point he showed her a video of a naked woman "giving sex to herself." Appellant then asked the victim if she wanted to try it, and put his hand down her pants and began touching her vagina. The victim testified that appellant had his arm across her, holding her down, and that he put his finger inside of her and touched her for 15 to 20 minutes. She testified that she was frozen and just tried to focus on the movie, but that it hurt. At the end, she told him "Stop, it hurts." The victim testified that her grandmother arrived home, and appellant stopped touching her and started messing around with his phone. When the victim's grandmother came into the garage, the victim got up to leave with her to go into the house. Appellant then stated that he had to go, and he left. The victim thought the incident occurred around 2:00 p.m., but stated she was not sure when

2.

she was confronted with the fact that she told the police that it happened around 5:30 p.m. After she went inside, the victim told her mother what had happened. The victim testified that she was taken that night to see the doctor.

{¶ 3} On cross-examination, the victim was asked why she told the police that the sex video she saw had a man and a woman. At first the victim testified that she did not remember that, but then stated that appellant actually showed her two videos, one with a girl by herself, and one with a boy and a girl. She did not remember why she told the police that she only saw one video. Regarding the timeline, the victim testified that the attack occurred, and then she was taken that day to the hospital. She did not shower in between. After the hospital, she changed her clothes, ate dinner, and went to bed. Regarding the incident itself, the victim testified that appellant spread her legs apart with his left hand, and touched her with his right hand. She further offered that while appellant was molesting her, his mom called, and he said that he had to get ready to go. However, it was not until the victim's grandmother came into the garage that appellant actually left.

{¶ 4} Julie Young, the sexual assault nurse examiner who examined the victim, also testified. She testified that the examination occurred at 2:00 p.m. on the day after the incident. At the beginning of the examination, she took a narrative history from the victim, which was read at the trial:

Patient stated, "I was in my dad's garage watching a movie." Patient stated, "he said, [Patient], come here, I want to show you something." Patient stated, "I went to the couch and he showed me a sex video."

Patient stated, "He said: Do you want to try it?" Patient stated, "I said try what, and he told me to sit on the couch."

Patient stated, "He put his hands down my pants and pushed my legs open so he could get his fingers inside of me."

Patient stated, "He kept on doing it for 10 to 20 minutes, then my grandma walked in." Patient stated, said, "He got up and said that he had to go." Patient stated, "We watched the movie on his phone." Patient stated, "I told him that was nasty and I would never want to do that."

{¶ 5} Young testified that she then examined the victim, and observed bruising and red marks on the victim's vagina. She detailed that there were abrasions between the four o'clock and ten o'clock locations on the vagina, that the labia was reddened from the three o'clock to the six o'clock location, and that the very bottom, the fossa navicularus, was bruised. She testified that the victim identified appellant as the person who touched her, and that he put his fingers in her vagina.

{¶ 6} On cross-examination, Young testified that the injuries were consistent with the victim's story, and that it is highly unlikely that the victim caused the injuries herself. Young also testified that the top part of the hymen appeared intact, but that she would not necessarily expect that the hymen would be broken by the alleged activity. She further

4.

stated that while there was no bleeding inside of the vagina, there was a lot of redness, but she conceded that there were ways other than a person sticking a finger in the vagina for the victim to experience rashes and a burning sensation. Finally, Young testified that she collected the underwear that the victim was wearing, which the victim stated was the same underwear that she was wearing at the time of the attack.

{¶ 7} The next person to testify was Julie Cox, a forensic scientist with the Ohio Bureau of Criminal Investigation and Identification. Cox testified that she examined the rape kit collected from the victim, and discovered the presence of seminal fluid on the interior crotch portion of the victim's underwear. Cox did not find any semen on the underwear or on any of the victim's oral, anal, or vaginal swabs.

{¶ 8} Hallie Garofolo then testified. She is a forensic scientist in the D.N.A. unit of the Ohio Bureau of Criminal Investigation and Identification, and was qualified by the court without objection as an expert in the field of forensic science. Garofolo testified that a partial D.N.A. profile was obtained from the swabs from the underwear, but that it was not sufficient for comparison. However, she was able to perform a Y-STR, which is a male specific D.N.A. test, that detected a Y-chromosome D.N.A. profile on the victim's underwear that was consistent with appellant. The Y-STR profile is the same for all paternal male relatives, and the estimated frequency of that particular profile is one in every 8,621 unrelated males.

{¶ 9} Following Garofolo, the victim's mother testified. She offered that the victim came inside and told her about the incident shortly after it happened. The mother

5.

stated that she did not immediately take the victim to the hospital because the victim "can be a story teller." However, the mother testified that the victim had never accused anyone of touching her before. That evening, the mother observed that the victim was uncomfortable and the victim told her that she was hurting in her vagina. The mother testified that the victim went to bed without showering that night, wearing the same panties that she had on during the day. The next day, the victim was taken to the hospital.

{¶ 10} The victim's grandmother also testified. The grandmother stated that when she walked in the garage, she saw the victim and appellant sitting close together on the couch. There were no other people in the garage. The grandmother testified that when the victim got up to go inside she looked tired, "like something was bothering her." On cross-examination, the grandmother could not remember if she arrived home at 3:30 p.m., 4:30 p.m., or 5:30 p.m. She also testified that she remembered seeing a cellphone in appellant's hand.

{¶ 11} The next person to testify for the state was Toledo Police Detective David Morford, who was certified as an expert in data analysis of forensics of cellular phones. Morford testified that his examination of appellant's cell phone revealed no data prior to July 19th. He opined to a reasonable degree of professional certainty that the lack of data suggested that either the phone was recently activated on July 19th, or that a factory reset had been performed on the phone. Morford further testified that it is highly unlikely that

6.

a factory reset would occur accidentally because the phone warns the user several times that the user is executing a factory reset and will lose all of his or her data.

{¶ 12} On cross-examination, Morford testified that the phone did not contain any pornographic materials. Morford also conceded that he was not certain that the phone underwent a factory reset, only that he assumed that it was.

{¶ 13} The final witness called by the state was Detective Ron Timmons of the Port Clinton Police Department. Timmons was the lead investigator on the case. Timmons testified that he first made contact with appellant's family on July 22, 2014, and scheduled an interview for July 23. On that day, Timmons asked appellant about an incident with the victim, at which time appellant's attorney invoked his right to remain silent and the interview was terminated. Thereafter, Timmons obtained a search warrant for appellant's cell phone, which was a metallic blue Samsung phone, and seized it on July 25, 2014. Timmons took the cell phone to the Toledo Police Department to be analyzed. In addition to the warrant for the cell phone, Timmons also obtained and executed a search warrant for a D.N.A. sample from appellant.

{¶ 14} On cross-examination, Timmons was asked about the differences in the story that the victim told him and the story that she presented on the witness stand. He noted that in court she stated that she was shown two videos, one of which was a female by herself. He also noted that she testified that she was examined on the same day as the attack, but he was informed that she was examined the next day. Timmons acknowledged that he was a little concerned that the victim's story changed from the time

7.

she told the nurse to the time that she talked to him, but he was not concerned regarding the changes at the time of trial because of the length of time that had elapsed.

{¶ 15} On re-direct, Timmons testified that he found the victim to be believable during his interview, and that there were a lot of similarities regarding the specifics of the assault that remained the same.

{¶ 16} Following the state's presentation of evidence, appellant took the stand in his own defense. Appellant testified that he was at the victim's house and was watching the movie Paranormal Activity with the victim, the victim's brother, and the victim's sister. He testified that he has never seen the movie Madagascar 3. He explained that he was on the couch, and that the victim was in a chair to the left of the couch. The movie ended right around 5:25 p.m., at which time the victim's brother went to a different part of the garage to get his bicycle. He testified that the victim's grandmother came into the garage while the brother was getting the bicycle. The brother then returned and they went to appellant's football practice together at 5:30 p.m. Appellant testified that he has never had a conversation with the victim, has never downloaded a sex video to his phone, did not show a sex video to the victim, and did not touch or insert his fingers into the victim's vagina. Regarding the cell phone, appellant testified that he dropped it on the carpet somewhere and it started to glitch, and then shut off. When he turned the phone back on it restarted and reset itself.

{¶ 17} Upon receiving the evidence and the closing arguments, the court took the matter under advisement. On June 17, 2015, the court entered its decision concluding

8.

that appellant had committed the offense of rape, and thus finding him to be a delinquent child.

{¶ 18} Appellant has timely appealed the trial court's judgment, and now presents three assignments of error for our review:

    I. The repeated instances of improper bolstering of the alleged victim's testimony through hearsay statements deprived appellant of his state and constitutional rights to due process and a fair trial under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

    II. Appellant's convictions are not supported by proof beyond a reasonable doubt.

    III. Appellant's convictions are against the manifest weight of the evidence.

## Analysis

{¶ 19} In his first assignment of error, appellant argues that the trial court erred when it allowed the state to introduce hearsay statements made by the victim to other witnesses, thereby bolstering her testimony. Specifically, appellant cites testimony by Young, the sexual assault nurse examiner, and Timmons, the lead detective, as particularly problematic. Appellant concludes that the court's allowance of this testimony was so egregious that it violated his fundamental rights to a fair trial and to due process.

9.

**{¶ 20}** In response, the state first argues that the testimony provided by Young falls under the hearsay exception in Evid.R. 803(4) for "Statements for purposes of medical diagnosis or treatment."

**{¶ 21}** We review the trial court's decision to allow hearsay testimony under Evid.R. 803(4) for an abuse of discretion. *State v. Dever*, 64 Ohio St.3d 401, 405, 596 N.E.2d 436 (1992). A child's statements may be admitted at trial as an exception to the hearsay rule pursuant to Evid.R. 803(4) if they were made for purposes of medical diagnosis or treatment. *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 46. The trial court's determination of the purpose of the child's statements will depend on the facts of the case, and should take into consideration at least: "(1) whether the child was questioned in a leading or suggestive manner * * *; (2) whether there is a motive to fabricate, such as a pending legal proceeding such as a 'bitter custody battle' * * *; and (3) whether the child understood the need to tell the physician the truth." (Internal citations omitted.) *Id.* at ¶ 49. "In addition, the court may be guided by the age of the child making the statements, which might suggest the absence or presence of an ability to fabricate, and the consistency of her declarations." *Id.* Furthermore, "the court should be aware of the manner in which a physician or other medical provider elicited or pursued a disclosure of abuse by a child victim, as shown by evidence of the proper protocol for interviewing children alleging sexual abuse." *Id.*

**{¶ 22}** Here, considering the totality of the circumstances, we hold that the trial court did not abuse its discretion in allowing the hearsay testimony under Evid.R. 803(4)

10.

as the statements were made for purposes of medical diagnosis and treatment, and thus were sufficiently reliable to be admitted through Young's testimony. In reaching that conclusion, we note that Young testified that she discussed the importance of being honest with the victim, and the victim appeared to understand. Additionally, we note that Young asked open ended questions, that according to Young the injuries were consistent with the victim's story, and that the record contains no indication of a motive to fabricate the story. Therefore, we hold that Young's testimony recounting the victim's statements were properly admitted and did not constitute impermissible bolstering of the victim's testimony.

{¶ 23} Turning to Timmons' testimony, the state argues that the invited-error doctrine applies. "Under the invited-error doctrine, '[a] party will not be permitted to take advantage of an error which he himself invited or induced.'" *State v. Bey*, 85 Ohio St.3d 487, 492-493, 709 N.E.2d 484 (1999), quoting *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.*, 28 Ohio St.3d 20, 502 N.E.2d 590, paragraph one of the syllabus. Here, the purportedly offending testimony, wherein Timmons recounted the victim's statements, occurred in response to a question on cross-examination. Thus, we find that the invited-error doctrine squarely applies, and we hold that appellant's argument of improper bolstering of the victim's story through Timmons' testimony is without merit.

{¶ 24} Accordingly, appellant's first assignment of error is not well-taken.

11.

{¶ 25} In his second assignment of error, appellant argues that the evidence is insufficient to support a finding that the elements of rape have been proven beyond a reasonable doubt.

{¶ 26} "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 27} Here, appellant was found to have committed rape, in violation of R.C. 2907.02(A)(1)(b), which states, "No person shall engage in sexual conduct with another who is not the spouse of the offender * * *, when any of the following applies: * * * (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person," and 2907.02(A)(2), which states, "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." "'Sexual conduct' means * * * without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." R.C. 2907.01(A). "'Force' means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1).

12.

{¶ 28} Appellant argues that the victim's testimony was not sufficient to meet the definition of sexual conduct, given the variance between her testimony at trial and her statements shortly after the alleged incident. Furthermore, appellant vehemently denied that he ever touched the victim.

{¶ 29} However, when viewed in a light most favorable to the prosecution, the victim's testimony establishes that she was less than 13 years of age, that appellant had his arm across her, holding her down, and that he penetrated her vagina with his finger. Therefore, we hold that the evidence was sufficient to support the trial court's finding of delinquency.

{¶ 30} Accordingly, appellant's second assignment of error is not well-taken.

{¶ 31} In his third assignment of error, appellant argues that his conviction is against the manifest weight of the evidence.

{¶ 32} When reviewing a manifest weight claim,

> The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *State v. Lang*,

13.

129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, quoting *Thompkins* at 387.

{¶ 33} In support of his assignment of error, appellant contends that the victim's testimony changed significantly from the initial interview. Specifically, he points out that the victim initially told the investigators that she told her mother about the assault later in the evening, but at trial she testified that she told her mother immediately after it happened. The victim also told the investigators that she was shown a sex video with a man and a woman, but at trial she testified that it was a video of a woman by herself. She then testified that she was shown two videos, but told the investigators that she was only shown one. Furthermore, she testified at trial that she was taken to the hospital on the day that the assault occurred, but the records show that she was taken the next day. Finally, she initially told investigators that the event occurred around 5:30 p.m., but appellant testified that he had already left for football practice by that time.

{¶ 34} In addition to the inconsistencies in the victim's testimony, appellant notes that no sex videos were found on his phone. Appellant also contends that the evidence does not establish that he was the one who caused the injuries to the victim's vagina.

{¶ 35} Upon our review of the evidence, we find that this is not the exceptional case where the trier of fact clearly lost her way. While there are some inconsistencies in the victim's testimony pertaining to the timeline, the salient points are consistent: appellant showed her a sex video, spread her legs, and penetrated her vagina with his finger. The victim's testimony is supported by Young's testimony that the injuries to the

14.

victim's vagina appear to have been caused by that kind of digital penetration. Furthermore, appellant's Y-chromosome D.N.A. profile was found on the victim's underwear. The circumstances of the assault are also supported by the grandmother's testimony that she observed appellant and the victim sitting next to each other on the couch, and the fact that appellant's cell phone coincidentally was reset after the incident. Based on this record, we hold that appellant's conviction was not against the manifest weight of the evidence.

{¶ 36} Accordingly, appellant's third assignment of error is not well-taken.

## Conclusion

{¶ 37} For the foregoing reasons, we find that substantial justice has been done the party complaining, and the judgment of the Ottawa County Court of Common Pleas, Juvenile Division, is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.          _____
                                                    JUDGE
Arlene Singer, J.

Stephen A. Yarbrough, J.          _____
CONCUR.                                            JUDGE

                                  _____
                                                    JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.sconet.state.oh.us/rod/newpdf/?source=6.