OPINION
{¶ 1} In the instant appeal, submitted on the record and briefs of the parties, defendant-appellant, Robert E. Brown, seeks review of his judgment of conviction and sentence issued by the Portage County Court of Common Pleas, following a trial by jury, on one count of Rape, one count of Gross Sexual Imposition and one count of Kidnapping, a felony of the first degree with a sexual motivation specification. He was subsequently adjudicated a sexual predator. For the reasons that follow, we affirm the judgment of the trial court. *Page 2 
 {¶ 2} The instant charges arose from a chain of events which began on the morning of July 23, 2006, and culminated in the early morning hours of July 24, 2006, in which Brown, a guest in the home of Gabriel D. ("Buddy") and Priscilla W. ("Priscilla"), was accused of removing Buddy and Priscilla's six-year-old daughter, D., from an upstairs bedroom and taking her to a bathroom on the first floor, where he digitally penetrated her vagina and subsequently dropped her, naked, out of the bathroom window to avoid detection.
 {¶ 3} The following relevant facts are not in dispute. On the morning of July 23, 2006, Priscilla, her brother, Paul, and Priscilla's two children, were in the backyard of Priscilla and Buddy's home, located in Ravenna, Ohio. The family had lived in the house for approximately three months. That morning, the victim and her younger brother were playing in a small swimming pool in the backyard while Priscilla and Paul watched. Brown, who lived with his mother in a home adjacent to Buddy and Priscilla's yard, was helping his mother hang clothes to dry. The children, who were curious about what he was doing, approached the fence and began asking Brown questions. Brown engaged the children, Priscilla and Paul in conversation for a period of time and, with Priscilla's permission, gave the children ice cream.
 {¶ 4} According to the Brown, who is a self-admitted alcoholic, he went to a nearby bar to drink after he had finished helping his mother with the laundry. Returning from the bar early that evening, he noticed Priscilla and Paul sitting on the front porch watching the children ride bicycles. Brown then approached the house and began engaging the adults in conversation.
 {¶ 5} Shortly thereafter, Buddy returned home. Brown, who had finished some beer he had with him when he was conversing, began drinking and conversing with the *Page 3 
men on the porch. Several hours later, as it was getting dark, the group, including Brown, Priscilla and the children, decided to take a walk to a nearby drive thru.
 {¶ 6} At the drive thru, Brown and Buddy each purchased twelve packs of beer, and Buddy purchased some cigarettes. Upon returning home, Priscilla and the children went inside, where Priscilla turned on a movie for the children watch. The men stayed outside drinking and talking. Eventually, Priscilla took the children upstairs to the master bedroom, where the entire family slept during hot weather, and put the children to bed. In the master bedroom, D. slept on her own mattress on the floor, while her brother slept in bed with their parents.
 {¶ 7} Eventually, the men moved from the porch into the living room, and began watching a movie. At this point, the State's and Brown's versions of events diverge considerably. The only consistencies in the respective stories are that D. turned up missing, and later appeared at the front door, wrapped only in a towel. She was shaken up and crying. Upon further investigation and examination, it was later determined that she had been sexually molested.
 {¶ 8} On July 28, 2006, the Portage County Grand Jury issued an indictment against Brown, charging him with one count of Rape, a felony of the first degree, in violation of R.C. 2907.02(A)(1)(b); one count of Gross Sexual Imposition, a felony of the third degree, in violation of R.C. 2907.05(A)(4); and one count of Kidnapping, a felony of the first degree, in violation of R.C. 2905.01(A)(4), with a sexual motivation specification, in violation of R.C. 2941.147.
 {¶ 9} On August 1, 2006, Brown appeared for arraignment with appointed counsel and entered a plea of not guilty to the charges. *Page 4 
 {¶ 10} On September 26, 2006, Brown filed a motion to suppress the photo array used to identify him, which was subsequently denied by the court. On September 28, 2006, a motion was filed for an inquiry into Brown's competency to stand trial. On December 18, 2006, the trial court determined that Brown was competent to stand trial.
 {¶ 11} On January 16, 2007, Brown filed a motion in limine to exclude certain out-of-court statements made by D. to her mother and Nurse Carolyn Johnson from the Children's Advocacy Center at Robinson Memorial Hospital.
 {¶ 12} The matter proceeded to trial the next day. At trial, the court allowed the statements challenged by Brown's motion in limine to be admitted. At trial, Priscilla, Buddy, and Paul all testified, along with police and representatives from the Children's Advocacy Center. Brown testified in his own defense. Following trial, the jury found Brown guilty as charged on all three counts. The jury further made the additional findings that the rape victim was less than ten years old and that the kidnapping was committed with sexual motivation.
 {¶ 13} Following a presentence investigation report, the trial court sentenced appellant. At the sentencing hearing, the court merged Brown's convictions for Gross Sexual Imposition and Rape. The court subsequently sentenced Brown to a life prison term for Rape to be served consecutive to a ten year prison term for Kidnapping. Appellant was also adjudicated a sexual predator.
 {¶ 14} Brown timely appeals these judgments, assigning the following as error for our review:
 {¶ 15} "[1.] The evidence presented was insufficient and the Defendant's conviction was against the manifest weight of the evidence. *Page 5 
 {¶ 16} "[2.] The trial court abused its discretion in imposing the maximum sentence to the defendant [sic]."
 {¶ 17} In his first assignment of error, Brown argues that his conviction was based upon insufficient evidence, since the only evidence linking him to the crimes of Rape and Kidnapping were statements of the six-year-old victim, introduced at trial through the testimony of her mother and Nurse Johnson of the Child Advocacy Center.
 {¶ 18} The admission or exclusion of evidence, including the admission of what might otherwise constitute hearsay absent a recognized exception, is a matter entrusted to the sound discretion of the trial court and will not be overturned absent a showing that the court abused its discretion. State v. Hand, 107 Ohio St.3d 378, 2006-Ohio-18, at ¶ 92. "An abuse of discretion is more than [a] mere error of law or judgment, rather it implies the court's attitude was unreasonable, arbitrary or unconscionable." State v. Hale, 11th Dist. No. 2007-P-0015,2007-Ohio-6244, at ¶ 63 (citation omitted).
 {¶ 19} "Hearsay, as defined by Evid.R. 801(C), is a statement, other than one made by the declarant while testifying at trial, offered into evidence to prove the truth of the matter asserted." Ryser v.Conrad, 11th Dist. No. 2001-T-0034, 2001-Ohio-8783, 2001 Ohio App. LEXIS 5450, at *7-*8. Under Evid.R. 802, hearsay is ordinarily not admissible at trial, unless one of the recognized exceptions applies. Id. at *8.
 {¶ 20} With regard to D.'s mother, Priscilla, Brown challenges the admissibility of the following testimony, upon finding D. missing from the house:
 {¶ 21} "Q: Who is the first of you to go downstairs and begin to look for her?
 {¶ 22} "A: Me and Buddy.
 {¶ 23} "Q: Tell us about that. *Page 6 
 {¶ 24} "A: We go down the steps and at that point, we didn't see Mr. Brown in the living room. We didn't know what to think. [D.] was gone, we wasn't concerned if the door was locked or not at that moment, we was looking for her. We go through the living room and standing in the living room and Buddy yells for [D.] and no answer. At that time Buddy says the bathroom water is running, the bathroom downstairs, so he goes and knocks on the bathroom door. Well, Bob opens the door, which I could hear him, didn't really see him very well, and he opens the door and says `I'm washing up, do you mind?' Kind of holding the door handle so you couldn't really open the door.
 {¶ 25} "Q: Where are you located? Where is Buddy at the time?
 {¶ 26} "A: Buddy is in front of the bathroom downstairs. I'm more like in the bend of the dining room and living room area, in the doorway.
 {¶ 27} "Q: What happens next?
 {¶ 28} "A: They — so Bob shuts the bathroom door and we go back upstairs, thinking, well, she's not down there, she's got to be upstairs. And we come through the living room again and Buddy says, There is Bob's clothes, there is his clothes in the living room.'
 {¶ 29} "That is all he said and we went back downstairs. Looked again, looked again each room, each closet, under the beds, back anywhere we could look upstairs we looked. She was not there. And at that time Buddy says, `Downstairs!'
 {¶ 30} "I'm like, `What?'
 {¶ 31} "He said he heard a slam or big loud noise or something. He came running down the steps. I was behind him. We get down the bottom of our stairs and here comes Bob through our living room, no shirt on, buckling his pants basically, and *Page 7 
says, `What's going on?' And then at that time there was like a little tap on our door and we look out and there is my daughter outside with a towel.
 {¶ 32} "Q: What was she wearing?
 {¶ 33} "A: Just a towel. She was naked.
 {¶ 34} "Q: What happened next?
 {¶ 35} "A: Bob went to reach to open the door and say, `[D.] what happened?' And she backed up from him and started crying and Buddy grabbed her and pulled her in the house and she —
 {¶ 36} "Q: What was her — how would you describe her condition at that point?
 {¶ 37} "A: She was crying. And real shaken up, scared.
 {¶ 38} "Q: What happened next?
 {¶ 39} "A: Buddy asked her how she got outside and she pointed to Bob and said, `Him, that man.'"
 {¶ 40} Brown objected to this identification testimony, and lodged a continuing objection to the testimony that followed. Later, during direct examination, Priscilla testified as follows:
 {¶ 41} "Q: She pointed out Bob as the person responsible for placing her outside. What happens immediately next?
 {¶ 42} "A: Buddy starts arguing with him. What happened, what is going on[?] He's acting like he doesn't know. So I take [D.] upstairs into our bathroom upstairs and I call the police.
 {¶ 43} "Q: Did you ask your daughter at that point what had happened to her?
 {¶ 44} "A: Yes.
 {¶ 45} "Q: What did she tell you? *Page 8 
 {¶ 46} "A: She wouldn't really say at the moment but then later on, a few minutes later I had thought to check her out and asked her if anything else happened and she said yes.
 {¶ 47} "Q: What did she say?
 {¶ 48} "A: That he touched her in her private.
 {¶ 49} "Q: What else did she say?
 {¶ 50} "A: I asked her if she heard us yelling for her, she said yes but she couldn't talk and she went, `Look,' that she said her neck hurt and she had marks right here.
 {¶ 51} "Q: Did she say why she couldn't talk?
 {¶ 52} "A: She said he choked her because she went to yell.
 {¶ 53} "Q: When did she say that occurred?
 {¶ 54} "A: When her dad was yelling for her, when we was downstairs the first time.
 {¶ 55} "Q: She was where?
 {¶ 56} "A: She said she was in the tub because he told her not to say anything and he stuck her there.
 {¶ 57} "Q" Which tub?
 {¶ 58} "A: In our downstairs bathroom.
 {¶ 59} "Q: Did she explain to you at that point how she got outside from the bathroom?
 {¶ 60} "A: She said he stuck her out the window.
 {¶ 61} "Q: and that is how she explained how she ended up outside?
 {¶ 62} "A: Yes. *Page 9 
 {¶ 63} "Q: Did she say anything else to you at that point?
 {¶ 64} "A: She was scared.
 {¶ 65} The trial court admitted this testimony under the excited utterance exception to the hearsay rule under Evid.R. 803(2).
 {¶ 66} The rule states that "[a] statement related to a startling event or condition made when the declarant was under the stress of excitement caused by the event or condition," is not excluded by the hearsay rule, even though the declarant is available as a witness. Evid.R. 803(2).
 {¶ 67} In deciding whether the statement of a declarant falls under the excited utterance exception to the hearsay rule, this court stated that "[f]or a purported excited utterance to be admissible there must have been: (1) and event startling enough to produce a nervous excitement in the declarant; (2) the statement must have been made while under the stress of the excitement caused by the event; (3) the statement must relate to the startling event; and (4) the declarant must have personally observed the event." State v. McCaleb, 11th Dist. No. 2002-L-157, 2004-Ohio-5940, at ¶ 41 (citations omitted). "[W]hen deciding whether a statement is an excited utterance, the court should consider: (a) the lapse of time between the event and the declaration; (b) the mental and physical condition of the declarant; (c) the nature of the statement; and (d) the influence of intervening circumstances." Id. at ¶ 42 (citation omitted).
 {¶ 68} Under the foregoing standard, both of D.'s statements to her mother are practically textbook examples of the excited utterance exception to the hearsay rule. D. arrived at the door within minutes after had she allegedly been sexually assaulted and dropped from the bathroom window, when she made the statement identifying Brown as "that man," who dropped her from the window. D.'s demeanor following the incident *Page 10 
was described as "crying," "shaken up" and "scared." She was found outside the house naked, wrapped only in a towel. With regard to D.'s second statement to her mother that Brown had choked her and touched her "private," this occurred almost immediately after Priscilla removed her from Brown's presence and took her upstairs to examine her for injuries. D. had fresh marks on her neck and, upon further examination, Priscilla also noticed that D. was bleeding from her vagina.
 {¶ 69} "The controlling factor [in an excited utterance analysis] is whether the declaration was made under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection." Id. at ¶ 43 (citation omitted). Under the circumstances, we cannot conclude the trial court abused its discretion by admitting the aforementioned testimony under the excited utterance exception.
 {¶ 70} Brown next challenges the admissibility of the testimony of Nurse Johnson of the Child Advocacy Center, which once again related D.'s statements that the man who had carried her down to the bathroom, "dropped her out the window," and touched her "private." The court admitted this testimony under the medical diagnosis or treatment exception to the hearsay rule, as embodied in Evid.R. 803(4).
 {¶ 71} Under that rule, "[s]tatments for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character ofthe cause or external source thereof, insofar as reasonably pertinent to diagnosis or treatment," are not excluded under the hearsay rule, "even though the declarant is available as a witness." Evid.R. 803(4).
 {¶ 72} "This court has held that for the medical diagnosis exception to apply it is not necessary that the statements be made directly to a physician." State v. Brazzon, *Page 11 
11th Dist. No. 2001-T-0050, 2003-Ohio-6088, at ¶ 20, quoting State v.Jett (Mar. 31, 1998), 11th Dist. No. 97-P-0023, 1998 Ohio App. LEXIS 1451, at *36. "A statement may fit within the scope of the exception if it is directed to other physical and mental health professionals, nurses, psychiatrists, psychologists, therapists, as well as to social workers." Id., citing In re Cory M. (1999), 134 Ohio App.3d 274, 281.
 {¶ 73} The basic underlying rationale for the medical diagnosis exception to the hearsay rule is the "selfish-interest rationale," based upon the belief that a person will be "motivated to tell the truth when seeking medical diagnosis or treatment because the person's well being might depend on expressing truthful information to the medical professional." Id. at ¶ 21(citation omitted). However, in State v.Dever, 64 Ohio St.3d 401, 1992-Ohio-41, the Ohio Supreme Court recognized the weakness of the "selfish-interest rationale" as it relates to children, realizing that while "the initial desire to seek treatment may be absent" in a child declarant, that "motivation certainly can arise once the child has been taken to the doctor." Id. at ¶ 21, quoting Dever, 64 Ohio St.3d at 410.
 {¶ 74} Rather than emphasizing the selfish-interest rationale, the Court in Dever held, "the cornerstone of admissibility under Evid.R. 803(4)," when the declarant is a young child is "whether the statements are reasonably pertinent to diagnosis or treatment." Id. at ¶ 22 (citation omitted).
 {¶ 75} "In making this determination, a trial court must consider the circumstances surrounding the child's out-of-court statements to determine if it was made to a medical professional for the purposes of diagnosis or treatment." Id. (citations omitted). "If the court finds that the child's statements were made for the purpose of diagnosis or treatment, the evidence should be admitted." Id. (citation omitted). "If, however, the trial court does not find sufficient factors indicating that the *Page 12 
child's statements were made for the purpose of medical diagnosis or treatment, the statements must be excluded as not falling within the ambit of Evid.R. 803(4)." Id. (citation omitted).
 {¶ 76} After the interview about the incident between D.'s parents and Detective Greg Francis of the Ravenna Police Department concluded at approximately 5 a.m., he set up an appointment for D.'s parents to bring her to the Child Advocacy Center at Robinson Memorial Hospital at 9:00 a.m., so that D. could have a physical examination. While the aforementioned interview was being conducted, D. was sleeping, and Detective Francis never asked her about the incident. After setting up the appointment and before leaving the house, Detective Francis told the parents to allow D. to continue sleeping and not wake her until it was time for the appointment. He also admonished D.'s parents not to talk about anything that happened that night.
 {¶ 77} Nurse Johnson later met with D. for the examination and testified, in relevant part, as follows:
 {¶ 78} "[D.] came to our center with her mother and father. I think a grandmother came with them. When — I talked to her for just a minute out in the hallway, I talked to the parents and then went and talked to [D.] by herself in our interview room and then in [later in] our medical exam room.
 {¶ 79} "Q: Did you tell [D.] who you were?
 {¶ 80} "A: I did.
 {¶ 81} "Q: Did you explain to her why she was there?
 {¶ 82} "A: I did. I told her I was a nurse and I wanted to make sure her body was okay and I was going to be asking her a lot of questions to make sure I knew what was going on. *Page 13 
 {¶ 83} "* * *
 {¶ 84} "Q: And then you go where to speak to [D.]?
 {¶ 85} "A: Into an interview room which is right in our center * * *. As we go into the room it's just the child and myself * * * — we almost never have a parent or another person in there, just a room that has two couches in it * * * — has a little table in front of the two couches as well as some markers and paper on it. I always tell the children they can draw or doodle, whatever, as we're talking. Has a couple of little chairs if they want to sit there, it has a clock in it. That's about it.
 {¶ 86} "* * *
 {¶ 87} "Q: How do you make a determination if you're going to do an actual physical exam on the child?
 {¶ 88} "A: If the child talked about any injury they received or anything that hurts * * * we do a medical exam."
 {¶ 89} Nurse Johnson then explained that employees at the Child Advocacy Center are trained not to ask leading questions, but rather are to base their questions upon the child's answers. In describing the interview process with D., Nurse Johnson testified that she "asked [D.] if she knew why she was there and she said, yes, because of my hand. And I said tell me what happened with your hand. And [D.] said he got me out the window, the guy that was spending the night, he was sleeping on the couch.
 {¶ 90} "And I said `What guy is this?' And she said, This guy that was sleeping on the couch that night, he threw me out that window.'
 {¶ 91} "And I said `Which window?'
 {¶ 92} "And she said The downstairs bathroom window, he threw me out that window.' *Page 14 
 {¶ 93} "So I looked at her hand, I looked at her finger, had her try to move it. She could move it. I looked at that for awhile. I asked her to tell me what else happened. She said they were all watching a movie and I said, `Who was watching a movie?'
 {¶ 94} "And she said `Me and my dad and my mom and my Uncle Paul and this man.'
 {¶ 95} "* * *
 {¶ 96} "She talked about what she was wearing and kind of went through that night. She said they were watching this movie and she went to bed. At different times she said that `He threw me. He opened the window and he dropped me out the window and that hurt.'
 {¶ 97} "She said `I landed on the ground,' and she talked about how her head hurt and her finger hurt when she was dropped out that window.
 {¶ 98} "Q: Did you ever ask her if he touched any other part of her body?
 {¶ 99} "A: I said, `Did anything ever — did he hurt anything other than your finger?' Because she talked about this finger being hurt and she said `Yes.'
 {¶ 100} "She pointed to the left side of the back of her head, she said she got hurt there, too. * * * I asked if there is anywhere else. She said no."
 {¶ 101} Nurse Johnson talked about D.'s reluctance to speak about the events of that night.
 {¶ 102} Nurse Johnson further testified as follows:
 {¶ 103} "[D.] [was] very emotional, would cry a lot. Not outright sobbing, she would start crying and say she wanted to see her mom. I said `Okay, we can go see your mom, let's just finish up here.' She would do that. *Page 15 
 {¶ 104} "Couple times I redirected her and talked about something totally different, like * * * about what * * * she likes to do * * * and she talked about riding her scooter. And she was very talkative and would talk open and freely about this. And when we started to talk about this man again that had been there and what he had done to her she would start to cry again different times and she talked about how she didn't want him to touch her, he'd touched her and she didn't like this guy touching her.
 {¶ 105} "* * *
 {¶ 106} "I had already gotten a history from the mom, some of the things the mother was concerned about injurywise with her and her body, so I was just trying to get what [D.] knew, what happened, so I could figure out how to treat her. I asked her several times what happened. She said `He dropped me out the window, that is how I hurt my head.'
 {¶ 107} "One point she talked about him, how the man carried her. She was upstairs in her mom's room, the mom was getting a shower. The man came upstairs and carried her downstairs and put her on a little couch and she said `He laid me on the little couch, he brung me into the bathroom.'
 {¶ 108} "I asked what bathroom, she said, The downstairs bathroom. He stuck me out the window. And she said her jammies were on the side of the couch, that at one point * * * she took them off because she was hot. Another time later she said, after we'd talked, she said he told her to take them off, that is why she took her jammies off."
 {¶ 109} Nurse Johnson testified that after a while, it became impossible to continue the forensic interview because D. "just was really crying and I couldn't redirect her at all because she just didn't want to talk any more, which is typical of a six-year-old kid." At that point, Nurse Johnson determined that a medical exam was in order, and *Page 16 
gave D. the choice of having her mother in the medical examination room, which is not separate from the interview area, which is the only area where police can view the interview process via a closed-circuit television feed.
 {¶ 110} Nurse Johnson described the examination room as "an office with a normal exam table there. We have it painted with fish all over the wall and I tell [children] it's our fishy room. I show them around and talk to them about it.
 {¶ 111} "I * * * asked her to take her clothes off so I could see her injuries * * *. The mother helped [D.] remove her clothes and put on a hospital gown. She was fine with that. I started looking at her, she had some marks on her head, face and back and different things I could see right away.
 {¶ 112} "I asked again, I said, `[D.], tell me again what happened. You said this man dropped you out the window and that * * * because of that you got your head and your finger hurt.
 {¶ 113} "I said, `Is there any other way he hurt you?'
 {¶ 114} "And she said — she looked at her mom. Again during the interview she had been crying a lot and this point she wasn't crying at all, she was very calm. She looked at her mom and said, `I already told you, I told my mom.'
 {¶ 115} "Her mom said, `Honey, I wasn't there when it happened and neither was the nurse, you need to tell the nurse what happened so she can treat you.'
 {¶ 116} "[D.] just turned around, she was very calm. She looked at me and said, `Yes, he hurt my finger and my private.'
 {¶ 117} "I said, `What is a private? What does that mean?'
 {¶ 118} "And she pointed to her vaginal area. I said Tell me what happened. Tell me how he hurt you there.' *Page 17 
 {¶ 119} "[D.] said, `He touched me with his finger,' and held up her right index finger. She held up her right index finger, she said, `He touched me with a finger like this one.'
 {¶ 120} "She said, `He touched me with only one finger,' and, she said, `it hurt really bad.'
 {¶ 121} We conclude the trial court did not abuse its discretion in determining Nurse Johnson's testimony is admissible under Evid.R. 803(4), as being "reasonably pertinent" to D.'s "medical diagnosis or treatment."
 {¶ 122} Nurse Johnson testified that the Child Advocacy Center was located within the hospital. Upon first meeting D. approximately six hours after the incident, Nurse Johnson immediately identified herself as a nurse and explained that she "wanted to make sure her body was okay" so she "was going to be asking a lot of questions to make sure [she] knew what was going on." Nurse Johnson testified that she had been trained not to ask leading questions, and the foregoing testimony makes clear that she did not. Detective Francis' testimony made clear that D. was asleep while her parents were being interviewed, that he did not speak with D. about the incident, and that he instructed her parents to allow D. to sleep until it was time to go to the hospital, and to not speak of the incident. Although Detective Francis testified he viewed a portion of the forensic interview through closed circuit television, D. was unaware of his presence. In addition, Detective Francis, was not privy to any of the information D. provided Nurse Johnson in the exam room. It is also clear from Nurse Johnson's testimony that D.'s mother did not influence or lead D. in any way, other than to state that D. needed to "tell the nurse what happened so she [could] treat [her]." *Page 18 
 {¶ 123} Even if Nurse Johnson's testimony had not fallen under the medical exception, admission of the testimony would have been harmless error, based upon the fact that it was cumulative to Priscilla's testimony, which, as we determined previously, was admissible under the excited utterance exception to the hearsay rule.
 {¶ 124} Notwithstanding our conclusion that the aforementioned evidence is admissible, Brown, relying upon Crawford v. Washington
(2004), 541 U.S. 36, maintains that the admission of these statements at trial was prejudicial error, since they were made without the trial court making a determination of the D.'s competency to testify. By failing to make such a competency determination, Brown argues that the trial court violated his Sixth Amendment right to confront his accuser under Crawford. We disagree.
 {¶ 125} In Crawford, the Supreme Court of the United States held that "[w]here testimonial hearsay is at issue * * * the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination," before such evidence is admitted.541 U.S. at 68. However, the court further held that "[w]here non[-]testimonial hearsay is at issue, it is wholly consistent with the Framer's design to afford the States flexibility in their development of hearsay law." Id.
 {¶ 126} Thus, we first must determine whether the aforementioned evidence is "testimonial" or "non-testimonial" in nature.
 {¶ 127} The Supreme Court, in Crawford, did not explicitly delineate what distinguishes a testimonial from a non-testimonial statement, but did offer guidance. The court stated that "`[testimony' * * * is typically `[a] solemn declaration or affirmation made for the purpose of establishing and proving some fact.'" 541 U.S. at 51 (citation omitted). "An accuser who makes a formal statement to government officers bears *Page 19 
testimony in a sense that a person who makes a casual remark to an acquaintance does not." Id. (emphasis added).
 {¶ 128} The Court, instead, offered "formulations of this core class of `testimonial' statements," which include: (1) "ex parte in-court testimony or its functional equivalent," including "material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;" (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," and; (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 51-52 (citations omitted); State v. Stahl, 111 Ohio St.3d 186, 2006-Ohio-5482, at ¶ 19.
 {¶ 129} In Davis v. Washington, the Supreme Court refined this formula, when it held that not all statements to governmental authorities, in this case, the police, are testimonial, but rather depend on the "primary purpose" of the interaction and/or interrogation.547 U.S. 813, 126 S.Ct. 2266, 2273-2274 ("Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."); accord State v. Siler,116 Ohio St.3d 39, 2007-Ohio-5637, at ¶ 33 ("the test set forth in Davis centers on the statements and the objective circumstances indicating the primary purpose of the interrogation"). *Page 20 
 {¶ 130} Based upon the aforementioned authority, D.'s statements to her mother, as properly admitted under the "excited utterance" exception, are clearly non-testimonial, since they were not made to police or other governmental authorities.
 {¶ 131} Nor was the admissibility of the mother's testimony as to what D. said contingent on a determination of D.'s competency, since "the circumstances involving an excited utterance make that exception suigeneris with respect to requiring competency of a child declarant."State v. Said, 71 Ohio St.3d, 473, 477 fn.1, 1994-Ohio-402, citingState v. Wallace (1988), 37 Ohio St.3d 87, 94-95. Furthermore, "when hearsay evidence is presented under the auspices of Evid.R. 803(2) * * *, `the issue of the declarant's availability is irrelevant.'" State v.Johnson, 6th Dist. No. L-05-1001, 2006-Ohio-1232, at ¶ 30 (citation omitted). Thus, the Confrontation Clause concerns as discussed inCrawford are not implicated in this case.
 {¶ 132} With regard to D.'s statements to Nurse Johnson, which were properly admitted as falling under Evid.R. 803(4) governing statements made for purposes of medical diagnosis or treatment, the Supreme Court of Ohio has recently held that "[statements made to medical personnel for purposes of diagnosis or treatment are not inadmissible underCrawford, because they are not even remotely related to the evils which the Confrontation Clause was designed to avoid." State v. Muttart,116 Ohio St.3d 5, 2007-Ohio-5267, at ¶ 63 (citations omitted). Moreover, these statements are admissible under the exception "regardless of whether a child less than ten years old has been determined to be competent to testify." Id. at ¶ 46.
 {¶ 133} Brown's first argument is without merit.
 {¶ 134} Brown next argues that the trial court erred by not granting his Crim.R. 29 motion for acquittal. Again, we disagree. *Page 21 
 {¶ 135} Under the Ohio Rules of Criminal Procedure, a defendant may move the trial court for a judgment of acquittal "if the evidence is insufficient to sustain a conviction." Crim.R. 29(A). "[Sufficiency of the evidence * * * challenges whether the state has presented evidence for each element of the charged offense. The test for sufficiency of evidence is whether, after viewing the probative evidence and the inferences drawn from it, in a light most favorable to theprosecution, any rational trier of fact could find all elements of the charged offense proven beyond a reasonable doubt." State v. Barno, 11th Dist. No. 2000-P-0100, 2001-Ohio-4319, 2001 Ohio App. LEXIS 4280, at *16, citing State v. Jones, 91 Ohio St.3d 335, 345, 2001-Ohio-57
(emphasis added).
 {¶ 136} Whether sufficient evidence has been presented is a question of law, thus, an appellate court is not permitted to weigh the evidence when making this inquiry. State v. Schlee (Dec. 23, 1994), 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, at *13 (citations omitted). Thus, an appellate court will examine the evidence and determine whether that evidence, "if believed, would convince the average mind of a defendant's guilt beyond a reasonable doubt." State v. Norwood, 11th Dist. No. 2005-L-047, 2006-Ohio-3415, at ¶ 15, citing State v.Jenks (1991), 61 Ohio St.3d 259, 273 (emphasis added).
 {¶ 137} In order to survive a sufficiency of the evidence challenge for a first-degree felony Rape offense, the prosecution must provide evidence to show Brown "engage[d] in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." R.C. 2907.02(A)(1)(b). "Whoever violates this section is guilty of rape, a felony of the first degree." R.C.2907.02(B). *Page 22 
 {¶ 138} With regard to Kidnapping, for the purposes of this case, the state, in order to survive a sufficiency of the evidence challenge, must provide evidence showing Brown "by force, threat, or deception, or, in the case of a victim under the age of thirteen * * *, by any means, * * * remove[d] another from the place where the other person is found or restrain the liberty of the other person * * * [t]o engage in sexual activity." R.C. 2905.01(A)(4).
 {¶ 139} "Sexual conduct" is defined, in relevant part, as "without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." R.C. 2907.01(A).
 {¶ 140} The Kidnapping charge also included a sexual motivation specification, pursuant to R.C. 2941.147(A). For the purpose of that statute, "sexual motivation" means "a purpose to gratify the sexual needs or desires of the offender." R.C. 2971.01(J).
 {¶ 141} The state provided evidence that six-year-old D. was removed from her bedroom where she slept during the early morning hours of July 24, 2006. There was evidence introduced that Buddy and Priscilla, who were taking a shower while Brown was downstairs drinking and watching a movie, returned to the bedroom and found D. missing. A search ensued in which Buddy, Priscilla, and Paul looked for D. on both the second floor and first floor of the house. Buddy testified that he yelled D.'s name, but she did not answer. While on the first floor, Buddy testified that he heard water running in the first floor bathroom and knocked on the door. When he attempted to open the door, Brown, who was inside, held the door to keep Buddy from entering and said, "I'm washing up, do you mind?" Buddy recalled seeing Brown standing in the bathroom, naked, and holding a washcloth. *Page 23 
 {¶ 142} Thinking that D. must still be upstairs, Buddy, Priscilla, and Paul returned to the second floor. While on the second floor, Buddy heard a loud sound from the first floor. Buddy and Priscilla stated that when they both returned downstairs, they encountered Brown, shirtless and buckling his pants. An argument ensued between Brown and Buddy. Shortly thereafter, Buddy heard a tap on the door and found D., naked and wrapped in a towel, standing outside.
 {¶ 143} D., crying and shaken, when asked by her father how she had gotten outside, pointed to Brown and said "that man," had dropped her out of the bathroom window. Buddy testified that the window in the bathroom was only held up by a screen insert which, when removed, caused the window to slam shut.
 {¶ 144} D. was immediately taken upstairs by her mother to be checked out. Her mother asked her if anything else had happened. D. stated that Brown had touched her in "her private." When asked if she had heard her father calling, D. stated that she had heard, but "couldn't talk" because Brown choked her. Priscilla, upon examining D., observed marks on her neck. Photographs of these marks were introduced at trial. Priscilla also noticed some blood in D.'s vaginal area.
 {¶ 145} Later, D.'s clothing was found near the couch on the first floor. These, along with the washcloth recovered from the first floor bathroom, were taken to the Forensic Biology Section of the Ohio Bureau of Criminal Identification and Investigation (BCI), to be analyzed. Brenda Gerardi of the BCI testified that the presumptive test for blood was positive on both the washcloth and the shorts that D. was wearing that evening.
 {¶ 146} As noted earlier, Nurse Johnson testified that D. stated "that man" had taken her from her bedroom, laid her on the couch, and told her to take her clothes off. *Page 24 
He then took her into the bathroom, and stuck his finger in her "private," and that "[i]t hurt really bad." D. told Nurse Johnson which finger Brown used. She stated that she heard her daddy yell, but she could not answer because "the man choked me and said don't talk." She stated she was "in the shower curtain" when her daddy was calling her name. She stated that the man dropped her out the window after her daddy had opened the door, and she hurt her head and her finger.
 {¶ 147} Nurse Johnson testified that she examined D.'s vagina with a colposcope, which revealed an injury to the vaginal area with blood and redness. Photographs of the examination were introduced as evidence at trial.
 {¶ 148} Dr. Daryl Steiner, of the CARE Center at Akron Children's Hospital, who regularly provides consultations for the Children's Advocacy Center, reviewed the colposcopic photos of D.'s injuries and determined, to a reasonable degree of medical certainty, that there were injuries "due to penetrating trauma into [D's.] genitalia causing injuries to the tissues of the hymen," and prescribed treatment based upon what he had seen. A later appointment and examination performed by Nurse Johnson, along with colposcopic photographs introduced at trial, revealed a marked difference in D's. physical condition.
 {¶ 149} Based upon the foregoing, the state provided ample evidence which, if viewed in the light most favorable to the prosecution, would allow the case to go to the jury on both charges. Brown's second argument is without merit.
 {¶ 150} Brown further argues that his convictions for Rape and Kidnapping were against the manifest weight of the evidence. We disagree.
 {¶ 151} In contrast to a sufficiency of the evidence challenge, manifest weight of the evidence raises a factual issue and involves "the inclination of the greater amount of *Page 25 credible evidence." State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52 (emphasis sic) (citation omitted). Where "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support the verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief."State v. Wilson, 113 Ohio St.3d 382, 2007-Ohio-2202, at ¶ 25 (citation omitted). "In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" Id.
 {¶ 152} Generally, the weight to be given to the evidence and the credibility of the witnesses is primarily for the trier of fact to determine. State v. Thomas (1982), 70 Ohio St.2d 79, at syllabus. When reviewing a manifest weight challenge, the appellate court sits as the "thirteenth juror." Thompkins, 78 Ohio St.3d at 387. As such, the reviewing court must consider all the evidence in the record, the reasonable inferences, the credibility of the witnesses, and whether, "in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed * * *." Id., quoting State v. Martin (1983),20 Ohio App.3d 172, 175.
 {¶ 153} Brown did not dispute being in the house that evening. However, in taking the witness stand, his version of events was markedly different from the state's.
 {¶ 154} Brown claimed that, after entering the house to watch the movie, four unidentified individuals, two men and two women, arrived at the home. Buddy left with the two men, and returned shortly thereafter. Arriving at the house, Buddy produced a bottle of pills, took one and began sucking on it, and gave another to Priscilla. He then proceeded to crush and cut the pills, and prepare them into "lines" on the table. Brown *Page 26 
claimed that at this point, D. came downstairs from where she was sleeping, and Priscilla told her to lay down on the couch.
 {¶ 155} Brown claimed that Buddy offered him a line, but being a former heroin addict, he refused. Brown stated he immediately finished his beer, stood up, and stated that someone should "turn them in to the Health Department" for doing drugs in front of the child. Brown stated that an argument ensued, and he left the house, at which point he returned to the drive thru, purchased another twelve pack of beer, and spent the rest of the evening in the rafters of a pavilion at City Park drinking beer.
 {¶ 156} In the instant case, there is reason to doubt Brown's credibility. After Brown claimed to have left the house immediately after observing the alleged drug activity, the prosecutor, on cross-examination, had the following exchange with Brown:
 {¶ 157} "Q: Don't you think if you c[a]me forward with this story other than when you made it up today, maybe somebody could have investigated that?
 {¶ 158} "A: If someone would have come to talk to me maybe I might have been able to do that.
 {¶ 159} "Q: [Detective Francis] didn't come talk to you?
 {¶ 160} "A: He didn't talk to me with my lawyer present, no, he didn't.
 {¶ 161} "Q: Did you write him a letter, call him, contact him, tell your lawyer, hey, here is the story?
 {¶ 162} "A: I contacted my lawyer several times on it. His case level was kind of full.
 {¶ 163} "Q: Are they [Buddy, Priscilla and Paul] telling the truth when she's standing outside on that porch, naked?
 {¶ 164} "A: Yes, she was in a towel, yeah. [Emphasis added] *Page 27 
 {¶ 165} "Q: And you know that because you were there, right?
 {¶ 166} "A: I — whenever I come back, yeah, we was sitting there.
 {¶ 167} When assessing the credibility of witnesses in a manifest weight analysis, "[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." State v. Awan (1986), 22 Ohio St.3d 120, 123. This is because it is "the trier of fact who is in the best position to observe and evaluate the demeanor, voice inflection, and gestures of the witnesses." State v. Dach, 11th Dist. Nos. 2005-T-0048 and 2005-T-0054,2006-Ohio-3428, at ¶ 42 (citation omitted). It is well-settled that "the factfinder is free to believe all, part, or none of the testimony of each witness appearing before it." Warren v. Simpson (Mar. 17, 2000), 11th Dist. No. 98-T-0183, 2000 Ohio App. LEXIS 1073, at *8. If the evidence is susceptible to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict. Id.
 {¶ 168} Based upon the foregoing, we cannot conclude that the jury lost its way or created a manifest miscarriage of justice in convicting Brown of the charges.
 {¶ 169} Brown's first assignment of error is without merit.
 {¶ 170} In his second assignment of error, Brown contends that the court abused its discretion by imposing the maximum sentence on him, alleging that the trial court failed to consider the "overriding purposes and principles of felony sentencing" as required by R.C.2929.11, and the seriousness and recidivism factors of R.C. 2929.12(B). We disagree.
 {¶ 171} The overriding purposes of felony sentencing in Ohio "are to protect the public from future crime by the offender * * * and to punish the offender." R.C. 2929.11(A). Moreover, a felony sentence must be consistent with other sentences *Page 28 
imposed for similar crimes, "reasonably calculated" to achieve the overriding purposes of felony sentencing, and "commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim." R.C. 2929.11(B).
 {¶ 172} A court imposing sentence for a felony "has discretion to determine the most effective way to comply with the purposes and principles of sentencing set forth in section 2929.11 of the Revised Code." R.C. 2929.12(A). Moreover, in State v. Foster, the Ohio Supreme Court emphasized that "[t]rial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." 109 Ohio St.3d 1, 2006-Ohio-856, at ¶ 100.
 {¶ 173} The Rape statute provides that "[e]xcept as otherwise provided * * * an offender under division (A)(1)(b) of this section shall besentenced to a * * * term of life imprisonment." R.C. 2907.02(B) (emphasis added). The language of the statute indicates that a life term is mandatory, thus the trial court did not abuse its discretion.
 {¶ 174} The statutory range of sentencing for first degree felonies is three to ten years. R.C. 2929.14(A)(1). In the case sub judice, appellant was sentenced to ten years on the Kidnapping charge, to be served consecutively with the Rape charge.
 {¶ 175} "[I]t is not the trial court's responsibility to research prior sentences from undefined, and largely unavailable, databases before reaching its sentencing decision." State v. Latessa, 11th Dist. No. 2006-L-108, 2007-Ohio-3373, at ¶ 57 (citation omitted).
 {¶ 176} In State v. Sanders, 11th Dist. No. 2006-L-222,2007-Ohio-3207, we stated "[t]he Ohio Supreme Court has characterized both R.C. 2929.11 and 2929.12 `as a general judicial guide for every sentencing.'" Id. at ¶ 16, citing Foster, 2006-Ohio-856, at ¶ 36. "There is no `mandate' for the sentencing court to engage in any factual finding *Page 29 
under these statutes, rather, `[t]he court is merely to "consider" the statutory factors.'" Id. (citation omitted). "Accordingly, the trial court is not required to make specific findings on the record to `evince the requisite consideration of the applicable seriousness and recidivism factors.'" Id., citing State v. Arnett, 88 Ohio st.3d 208, 215, 2000-Ohio-302. "Nor is a trial court required to make specific findings on the record in order to demonstrate that it engaged in the analysis under R.C. 2929.11 to ensure that the sentence is not demeaning to the seriousness of the offender's conduct." Id., citing State v. Green, 11th Dist. Nos. 2005-A-0069 and 2005-A-0070, 2006-Ohio-6695, at ¶ 35
(citations omitted).
 {¶ 177} Our review of the relevant portions of the record convinces us the trial court did not abuse its discretion by imposing the sentence herein.
 {¶ 178} Brown's second assignment of error is without merit.
 {¶ 179} The judgment of the Portage County Court of Common Pleas is affirmed.
TIMOTHY P. CANNON, J., concurs,
COLLEN MARY OTOOLE, J., dissents with a Dissenting Opinion.